ADOPTION OF RAMON.[1]

No. 95-P-1715.

Franklin. September 13, 1996. - November 25, 1996.

Present: WARNER, C.J., ARMSTRONG, & PERRETTA, JJ.

*Practice, Civil,* Findings by judge. *Adoption,* Dispensing with parent's
consent. *Parent and Child,* Dispensing with parent's consent to adop-
tion. *Evidence,* Child custody proceeding.

On parents' appeal from a decision adjudicating their child to be in need of
care and protection and dispensing with the need for the parents' consent
to adoption, the parents did not demonstrate that the judge's factual
findings were clearly erroneous with respect to trauma the child had suf-
fered, the parents' failure to provide proper medical care, and the avail-
ability of appropriate services to the family through the Department of
Social Services. [713-716]
At the trial of proceedings under G. L. c. 119, § 24, and c. 210, § 3, the
judge's findings were supported by clear and convincing evidence and
his conclusions that the parents were currently unfit to assume parental
responsibility for the child, that the Department of Social Services
should have custody, and that it was in the child's best interests that
parental consent to adoption be dispensed with were not clearly errone-
ous. [716-718]
In a proceeding to dispense with parental consent to adoption the judge did
not improperly weigh the parents' abilities against those of the child's
foster parents. [718]

PETITION filed in the Greenfield Division of the District
Court Department on March 3, 1993.

The case was heard by *Thomas T. Merrigan,* J.

*Dorothy Meyer Storrow* for the mother.

*Margaret M. Geary* for the father.

*M. Francisco Palomo* for the Department of Social Services.

*Beth A. Crawford* for the minor child.

WARNER, C.J. The parents appeal from a decision of a

[1]This name is a pseudonym.

District Court judge adjudicating their son, Ramon, now age five, to be a child in need of care and protection and dispensing with the need for his parents' consent to his adoption. We must decide whether the judge's findings of fact were clearly erroneous and whether they show clear and convincing evidence of parental unfitness.

The proceedings began under G. L. c. 119, § 24; the Department of Social Services (department) then moved for the court to determine whether it would be in Ramon's best interests to dispense with parental consent to his adoption. See G. L. c. 119, § 26(4); G. L. c. 210, § 3. After a trial on the merits of the department's petition, the judge issued his decision.

Certain undisputed facts were found by the judge and are as follows. Ramon was born on July 27, 1991, twenty-one days after his parents were married. The father abused alcohol and marijuana and would often become violent. When the mother feared for her safety during one of his rages, she had her parents come to their residence to add substances to the father's drinks so that he would fall asleep. The father would embark on drinking binges at least two times a month when the family received their welfare check. The parents were often unable to budget their money to provide healthy foods for the entire month.

On August 28, 1992, the father was arrested for attacking the mother. She posted bail for him. The family came to the department's attention due to that incident. On August 29, 1992, a report of neglect of Ramon was filed pursuant to G. L. c. 119, § 51A, as a result of the father's arrest for domestic assault and battery. An investigation mandated under G. L. c 119, § 51B, to evaluate the § 51A report of neglect of Ramon due to domestic violence between the parents revealed that the mother could not care for Ramon while the father was in jail because "Ramon reminded her too much of [the father]."

Between September, 1992, and March 3, 1993, the department conducted an assessment of the family and attempted to arrange services for them. At the family's residence, shortly before they were evicted, the department's social worker, Gina Parlee, observed piles of garbage in the sink, no food in the refrigerator, cat feces covering the floor, and cockroaches and flies. Visiting nurse services were provided by Nancy

Howes, a nurse with the Visiting Nurse & Health Services of Franklin County (VN & HS). Sue Williams, also of the VN & HS, began providing counseling to the parents in the fall of 1992. Jay Killough of REACH, an early intervention program for children with developmental disabilities, also began providing services to the family at that time. In addition, Parlee made a referral to Beacon Clinic for alcohol counseling for the father in November, 1992. However, the suggestions for improving personal hygiene, cleaning their dwelling and improving their nutrition and Ramon's medical care were not followed and the father refused to participate in the substance abuse program. The parents were also erratic in keeping Ramon's medical appointments.

In spring of 1993, Ramon's genitals swelled to twice their normal size and bled for two days from a severe diaper rash. His parents, however, did not make a doctor's appointment until Howes made a home visit and insisted that they do so. At the home, Howes observed that Ramon had been wearing a soiled diaper for a long time. She as well as Parlee observed that the family had chronic personal hygiene problems: the mother showered once a month, the father showered once every two months and Ramon was bathed once or twice a week. When the parents failed to bring Ramon to the appointment for his diaper rash and Parlee could not locate them at their residence, the department exercised emergency custody pursuant to G. L. c. 119, § 51B(3), and filed the care and protection petition.

This occasion was not the only time Ramon's parents neglected his medical care or missed scheduled doctor's appointments. On April 14, 1993, Howes found that medication for Ramon's ear infection, which was to be administered three times a day, had not been given at all. Pediatric medical records revealed that scheduled appointments were not kept, Ramon had a variety of "unexplained bruises," he and his parents were dirty when they came to the doctor's office, and Ramon was behind in his vaccinations.

On May 1, 1993, the mother suffered a spinal cord injury in an automobile accident. At the Cooley Dickinson Hospital, the father left his son unattended for approximately forty-five minutes. The hospital filed an emergency § 51A report and the department exercised its legal custody under the existing care and protection order and placed Ramon with foster

parents. Ramon adjusted easily to his foster home following his placement in May, 1993.

From October, 1993, to August, 1994, the father continued to abuse the mother physically. She obtained a G. L. c. 209A restraining order against him at one point while she stayed in a homeless shelter. The two also lived at various other locations during that time. In approximately October, 1994, the father was again arrested for assault and battery on the mother. The father had thrown a telephone at her, hit her in the elbow, and threatened to kill her. The father was subsequently found guilty of assault and battery and threatening to commit a crime (murder), and was given a suspended sentence of ten days in a house of correction. Due to this incident, the mother was taken by ambulance to the hospital with an elbow injury that required a cast.

To facilitate reuniting the parents with Ramon after Ramon came into the department's custody, the department arranged for a relative to care for Ramon and supervise weekend visits. Ramon was placed in the relative's care on October 8, 1993. However, except for one visit by the mother, neither parent came to see Ramon for the next month. Ramon was then returned to his original foster parents. After May, 1994, although parental visits were available two times a month, the parents only visited Ramon three times until the trial in February, 1995.

While Ramon lived with his relative, his foster parents had taken care of another foster child. Ramon became attached to this child when he was returned to his foster parents. When the child was returned to his parents in December, 1993, Ramon began experiencing "severe night terrors," which, at their worst, would wake him up every ten to twenty minutes.

Therapeutic treatment to alleviate this condition was provided by James Porter, a psychotherapist with the Valley Programs Clinic. Porter engaged in "play therapy" with Ramon. The sessions revealed a recurrent theme expressed by Ramon: the terrorization of a "mother" puppet by a "wolf" puppet. During this "play," Ramon would also talk about a third puppet, which was a child being left alone while the mother puppet expressed concern about it. Both foster parents were involved throughout this therapy, consulted Porter for advice on several occasions, and facilitated Ramon's improvement through their nurturing care. The sessions eventually ended as the nightmares became much less frequent.

Upon review of the record, we conclude that the following findings of fact of the judge were supported by the evidence and were not clearly erroneous. Further, we conclude that the record contained clear and convincing evidence of parental unfitness.

A. *Challenged factual findings.*

The parents challenge three of the trial judge's factual findings, that: (1) while in the care of his parents, Ramon was exposed to "something very frightening to him," through his parents' "own neglect or abuse," which traumatized him; (2) Ramon was denied proper medical care by his parents; and (3) the department offered appropriate services to the parents. The father separately argues that the trial judge unfairly incorporated many of the appellants' proposed findings.[2]

A trial judge's findings "must be left undisturbed absent a showing that they are clearly erroneous. . . . Moreover, the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." *Custody of Eleanor*, 414 Mass. 795, 799 (1993), and cases cited. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Ibid.* The burden is therefore on the appellant to show an appellate court that a finding is clearly erroneous. *First Pa. Mort. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-622 (1985). In this case, the appellants have not sustained that burden.

First, the parents' contention that Ramon did not witness something frightening to him which traumatized him, is belied by the mother's own testimony at trial and by experts' testimony to the contrary. That domestic violence occurred in the household is not disputed. Also, the mother admitted at trial that when the father's violence "would start in front of the baby," she would "take the baby away" to the bedroom. She stated that this happened on five or six occasions when Ramon was between three and six months old. The mother

---

[2]This argument will not be separately addressed as, "even in the event of verbatim adoption of a submission of counsel, an appellate court . . . does not change the standard of review." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 465 (1991) (citations omitted). See *First Pa. Mort. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 622 n.12 (1985).

additionally admitted the father would sometimes "los[e] control" and yell loudly at Ramon when Ramon was one and a half years old. Further, Porter, who has a master's degree in counseling psychology and who treated Ramon for sixteen sessions, testified that Ramon's "play therapy" formulations indicated "[Ramon] had been exposed to some sort of violence in the home environment, and a general lack of consistency in the home environment, and neglect as well." Dr. Carolyn Newberger, a developmental and clinical psychologist who is the research director of the Family Development Program at Children's Hospital, opined at trial that when a child experiences night terrors and "enact[s] themes in his or her play of children being attacked by others," it is "because there is something in that child's experience about which the child is very frightened."

This case is different from *Adoption of Stuart*, 39 Mass. App. Ct. 380, 389-390 n.15 (1995), which was remanded by this court because no physical evidence was introduced to corroborate the therapist's opinion that the child had been sexually abused. Here, the evidence shows that Ramon did witness domestic violence and experience night terrors. Moreover, the "play therapy" evidence and the conclusions of Porter and Dr. Newberger support the judge's finding that Ramon was disturbed by violence. See *Custody of Eleanor, supra* at 799. We recognize that "[t]here are significant reported psychological problems in children who witness domestic violence, especially during important developmental stages." *Custody of Vaughn*, 422 Mass. 590, 599 (1996), citing Cahn, Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions, 44 Vand. L. Rev. 1041 (1991). See Federico and Kinscherff, *Custody of Vaughn*: Impact of Domestic Violence On Child Custody; Children Are No Longer the Forgotten Victims, 40 Boston Bar J. 8 (Sept./Oct. 1996).

Second, the trial judge was not clearly in error in finding that Ramon was repeatedly denied proper medical care. The parents' contention that the trial judge based this finding on the sole incident of Ramon's diaper rash is not supported by the record. Neither is the mother's argument that there is nothing to show that a doctor would have prescribed something different from the ointment which she did apply to the rash. Here, the evidence shows that Ramon suffered a se-

vere diaper rash, during which he bled for two days before his parents would make a doctor's appointment, and then only at Howes's insistence. The report of the court investigator also supports Howes's observation that on the day she made a home visit and discovered Ramon's diaper rash, March 1, 1993, Ramon "looked as if he had sat in a soiled diaper for a long time," that the parents had no diapers or food, and had "no plan" for obtaining them. The evidence further shows that Ramon had an ear infection for which his parents could not properly administer his prescribed medication, and that he eventually needed to have tubes surgically inserted into his ears. Ramon's parents also had an admitted and documented inability to get him to his medical appointments, and pediatric records showed he was behind in his vaccinations. Accordingly, there is no clear error in the judge's finding of medical neglect. See *Custody of Eleanor, supra* at 799.

Third, the parents' contention that the department did not offer appropriate services to them has no merit. The mother claims that she is a victim of her own upbringing and suggests that the department should have helped her in other ways than it did. The father argues that the department used its services to facilitate its plot to take his son away from him. Neither position is supported by the evidence.

The evidence shows that the department offered counseling services and treatment to the mother before as well as after her marriage to the father. The mother would not enter a substance abuse program offered by the department because her boyfriend, her eventual husband, could not visit. The department also offered a variety of services to the parents after it became involved with the family in August, 1992. Visiting nurse services were provided by Howes. Williams began providing counseling to the parents in the fall of 1992. Killough of REACH also began providing services to the family at that time. In addition, Parlee made a referral to Beacon Clinic for alcohol counseling for the father in November, 1992. The department even attempted to bring the family together by placing Ramon with a relative.

However, the department's services and suggestions for improving personal hygiene, cleaning their dwelling and improving their nutrition and Ramon's medical care were not followed, and the father refused to participate in the substance

abuse program. The parents were also erratic in keeping appointments. Although the mother explains her lack of participation in counseling by asserting that the father controlled her life and would not let her visit Ramon or participate in services offered by the department, the department should not be faulted for the parents' refusal to utilize the offered services. Therefore, the trial judge's finding that the department offered appropriate services to the family was not clearly erroneous.

B. *Parental unfitness and dispensing with parents' consent to adoption.*

The judge concluded that the parents were currently unfit to provide for the care and protection of Ramon and that he should be committed to the department's custody. See G. L. c. 119, § 24.[3] The judge further found that the parents lacked the current ability, capacity, readiness and fitness to assume parental responsibility for Ramon, and that it would be in his best interests to dispense with the need for his parents' consent to his adoption. See G. L. c. 210, § 3. The parents contend that the evidence does not show clearly and convincingly that they are currently unfit to parent Ramon. They also argue that the trial court placed undue weight on the relationship between Ramon and his foster parents in determining that it was in his best interests to dispense with parental consent to his adoption. We do not agree.

General Laws c. 210, § 3, lists the factors a court may consider in determining the fitness of a child's parent to decide whether the best interests of the child would be served by dispensing with parental consent to adoption. The factors include: whether another member of the family has been abused; whether the child is younger than four years of age and a court has transferred custody of the child from the parent to the department and the parents were unable to utilize services offered to correct the situation; whether the parent, without excuse, failed to provide proper care and custody for the child and it can reasonably be inferred will not be able to

[3]The parents' arguments do not specifically contest the department's intervention under G. L. c. 119, § 24, except to suggest at oral argument that the department's intervention was premature and would not have happened if the mother had not been injured in the automobile accident. As such, their contentions regarding their unfitness will be addressed under the more stringent standard of G. L. c. 210, § 3.

do so in the future[4]; whether the child has formed a positive bond with a subsequent caretaker; the parent's capacity to meet the special needs of the child; the parent's lack of effort to remedy conditions creating the risk of harm to the child; failure to visit the child when the child is not in custody of the parent; and a condition which makes the parent unable to care for the child. See G. L. c. 210, § 3. "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." *Adoption of Mary*, 414 Mass. 705, 711 (1993).

First, the trial judge's comprehensive and trenchant findings show the parents' unfitness to care for Ramon by clear and convincing evidence. See *ibid*. The judge found that the parents' main and critical area of unfitness was their inability to break the cycle of violence and instability due to the father's alcoholism and their inability to protect Ramon from the consequences of their own proclivity to domestic instability. The evidence showed that: (1) the mother was continually abused by the father; (2) Ramon experienced medical neglect by his parents in their failure to take him to his doctor's appointments or properly treat his diaper rash and ear infections; (3) Ramon was under four years of age when a court transferred custody to the department and the parents did not correct the circumstances of neglect and domestic violence; (4) Ramon had formed a positive bond with his foster parents[5]; (5) the parents failed to use the variety of services offered to them by the department or attempt to remedy the areas of hygiene, household cleanliness, nutrition and the budgeting of money and domestic violence identified for them as areas

---

[4]We note that, although not part of the record on appeal, at oral argument it was undisputed that the mother had gone back to living with the father and had another child with him.

[5]At trial, Dr. Newberger opined that Ramon had formed his "primary bond" with his foster parents and that, due to his special need for continuity and stability because of the trauma he had suffered, he should be placed with a "stable family" sensitive to his psychological status. She also said that removing Ramon from his foster home would be very damaging to Ramon because it would be a "disruption in a bonded, trusted relationship." She considered the foster parents' home "exemplary," and Ramon's "best chance to do very, very well." Porter testified that the interactions between Ramon and his foster parents were "very caring" and that they "seemed very keyed in to Ramon and very sensitive to his needs."

needing change by the department; (6) the parents failed regularly to visit Ramon while he was in foster care; and (7) the father has a condition of chronic alcohol and marijuana abuse for which he refuses to be treated. There is no evidence to show a reasonable likelihood that the parents' unfitness at the time of trial might be only temporary, unlike the situation in *Adoption of Carlos*, 413 Mass. 339 (1992), and the parents have a long and documented history of domestic violence leading to Ramon's neglect. Therefore, the judge's determination that clear and convincing evidence exists to prove that both parents are unfit to provide for Ramon's best interests was not clearly erroneous. See *Adoption of Mary, supra.*

Second, we conclude that the trial judge properly considered Ramon's bond with his foster parents along with the other factors enumerated above in making his determination. "Although the bonding of a child with foster or adoptive parents is not a dispositive consideration, it is a factor that has weight in the ultimate balance." *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262-263 (1996). The parents' claim that the trial judge unfairly weighed their parenting abilities against those of the foster parents because he considered their poverty and that there was limited evidence concerning Ramon's attachment to them is not supported by the record.[6] Compare *Custody of a Minor*, 389 Mass. 755, 766-767 (1983) (judge's inappropriate comparison of the advantages the foster parents offered the child with those offered by the mother's unconventional lifestyle "d[id] not clearly recognize the mother's presumptive right to raise the child as she sees fit").

*Judgment affirmed.*

---

[6]The judge questioned Dr. Newberger at length about the significance of a biological link in determining the best interests of a child. Although Dr. Newberger endorsed Ramon's living with his foster parents as being in his best interest, she also stated that "it would be very helpful to Ramon not to have completely severed that biological tie." In questioning Dr. Newberger, the trial judge also stated, "I don't want to compare this set of parents to any other set of parents."