NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-89

ADOPTION OF PEDRO.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree of the Juvenile Court finding her unfit to parent her child, Pedro, terminating her parental rights as to him, and approving the adoption plan proposed by the Department of Children and Families (DCF).  The mother also appeals from the trial judge's order for posttermination and postadoption visitation, arguing that the judge abused his discretion in ordering only two visits per year.[2]  We affirm.

Background.  We summarize the judge's findings of fact where we find sufficient support in the record.  Pedro was born

---

[1] A pseudonym.

[2] The mother was the sole parent identified on Pedro's birth certificate, and no other parent came forward to establish parentage of him.  DCF met with the putative father in June 2019, but after his failure to participate in the care and protection proceeding, the judge issued an order striking him from the petition.  The judge deemed any father unknown and currently unfit to parent Pedro, and a decree entered terminating the unknown father's parental rights.

prematurely in May 2019 and hospitalized through the end of July 2019.  At that time, the mother had already had extensive involvement with DCF since 2000.  The mother's first three children were removed from her custody after multiple G. L. c. 119, § 51A reports (51A report), were filed alleging abuse and neglect of the children.  The mother's parental rights to the first three children were terminated, and they have since been adopted.  Subsequently, Pedro was born.

DCF opened a new case in May 2019 after a 51A report was filed alleging neglect of Pedro, based on the mother testing positive for marijuana two days before Pedro's birth.  In August 2019, Pedro was discharged from the hospital into the mother's custody, and they moved into a family shelter in Brookline.  On August 8, 2019, a staff member at the shelter filed a 51A report because the mother appeared to be impaired.  The emergency response workers who responded to the shelter reported that the mother appeared sober.  However, within eight hours, shelter staff filed two additional 51A reports describing the mother as "unconscious/passed out," and Pedro as having been found "face down, on the floor."  Pedro was transported to Tufts Medical Center.  A subsequent 51A report was filed after the mother arrived at the emergency room "appearing intoxicated, smelling of alcohol, slurring her word[s] and [having] glossy eyes."  As

2

a result, DCF removed Pedro on an emergency basis and filed a care and protection petition.[3]

Following removal, DCF placed Pedro in a foster home where he has resided ever since.[4]  DCF recommended an inpatient substance use disorder treatment program for the mother.[5] Instead, she participated in and completed a three-week outpatient hospital program.  Since completing this program, the mother has participated in multiple other programs, but has not

---

[3] The G. L. c. 119, § 51B, investigation also revealed that the mother's history of problematic substance use and untreated mental illness "likely contributed to the death of a fourth child, who . . . died soon after birth."  The judge found that "[a]t the time of [the fourth child's] birth, [the] [m]other tested positive for marijuana" and that the child "was found to have marijuana in her system as well."  The mother challenges this finding by the judge as erroneous.  The child's counsel concedes in her brief that the "judge did erroneously find that [the fourth child] 'was found to have marijuana in her system'" but contends that this finding is harmless because "[t]he relevant issue was not how the baby died, but the fact that [the] mother was using an illegal substance."  We agree that the error was not harmful and that the judge's determination of parental unfitness is supported by clear and convincing evidence as discussed herein.  See Adoption of Luc, 484 Mass. 139, 148 (2020).

[4] The mother raises concerns about Pedro's foster parents and their suitability as potential adoptive parents.  She notes, inter alia, that Pedro was subjected to inappropriate contact by a ten year old boy whom the foster parents were also fostering. The matter was reported by the foster parents to DCF, and the ten year old was promptly removed from the home.  As found by the DCF judge, the child is thriving in a loving and caring environment with the foster parents.

[5] Despite the mother's protestations to the contrary, the record supports the judge's finding that DCF recommended a long-term inpatient treatment program for the mother "[a]t the early onset of the case."

been consistent with her treatment.  The mother complied with mental health and substance use treatment and therapy for short periods of time but did not sustain long term treatment at an inpatient program.  In June 2020, DCF recommended that the mother complete a neuropsychological evaluation.  The mother responded that she had previously participated in a neuropsychological evaluation with one of her other children.  She initially agreed to complete the evaluation but failed to submit an evaluation report to DCF.[6]

On May 26, 2021, DCF updated the mother's action plan, requiring her to participate in substance use disorder and mental health treatment, individual therapy with a licensed therapist, an intensive outpatient program, the SMART recovery program, and a neuropsychological evaluation.  However, the mother missed therapy appointments in April and May 2021, stopped attending Alcoholic Anonymous meetings, failed to

---

[6] The mother contends that the judge erroneously relied on her failure to produce a new evaluation as evidence of unfitness, and that it was wrong for DCF to seek adoption of Pedro only days after requesting a neuropsychological exam.  We disagree and note that the judge's consideration of the mother's refusal to participate in the neuropsychological evaluation was reasonable.  See Adoption of Luc, 484 Mass. at 146-147, quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) (mother's "fail[ure] to recognize the need for or to engage consistently in treatment" and failure to provide the department with psychological evaluation was "relevant to the determination of unfitness").

4

complete the SMART recovery program, and did not submit a current neuropsychological as requested.

The mother has experienced multiple substance use-related relapses since Pedro's birth. Evidence adduced at trial supported the judge's determination that the mother was not able to maintain sobriety.[7] In January and February 2020, she was arrested for failing to participate in SCRAM alcohol monitoring testing. Then, in December 2020, she was charged with operating a motor vehicle under the influence. She was found guilty and incarcerated for sixty days.

Following removal of the Pedro, the mother had weekly supervised visits with him. While she consistently attended all visits as scheduled from August 2019 to October 2019, she began to miss some visits in December 2019. The mother's attendance rate decreased in 2020.[8] In January 2021, the mother attended a

_____

[7] The mother has an extensive history of community disturbances and involvement with the criminal justice system. Between June 2019 and September 2020, three abuse prevention orders were issued against the mother, and a domestic disturbance complaint was filed against her. She violated two of the abuse prevention orders.

[8] The mother contends that the judge's finding that "[a]s of June 2020, the foster mother reported that [the] [m]other had not been present for twenty-five percent of the visits" was erroneous and that the foster mother never mentioned the figure "twenty-five percent" in her testimony. However, on November 15, 2021, the foster mother did in fact testify that she "had a log where [the] [m]other missed [twenty-five percent] of the visits."

5

supervised in-person visit with Pedro and admitted to using marijuana prior to the visit.

In June 2020, DCF changed Pedro's permanency goal from reunification with the mother to adoption.  In July 2020, DCF mailed letters to all known maternal family members in an effort to identify potential kinship placements.[9]  DCF did not receive a response from any family members.  Ultimately, Pedro's foster parents, with whom he had lived for two years at the time of trial, committed to adopting him.  Following a trial in November 2021, the judge ordered the entry of a decree finding the mother unfit[10] and terminating her parental rights.  The judge also ordered two annual posttermination and postadoption visits between the mother and Pedro.  The mother appeals from the decree.

---

[9] The mother argues that DCF failed to comply with 110 Code Mass. Regs. § 7.101(2) (2009), which requires DCF to "consider, consistent with the best interests of the child . . . placement with a kinship family."  However, that regulation requires only that "reasonable effort[s] should be made to place a child in accordance with . . . [§] 7.101(2)."  The record indicates that DCF indeed mailed letters to all known maternal family members in July 2020, but received no responses.  In addition, the mother was provided family resource applications, but "DCF didn't receive any applications back from family members."

[10] "Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother . . . [does] not love the child" (citation omitted).  Adoption of Bea, 97 Mass. App. Ct. 416, 417 n.2 (2020).

6

Discussion. 1. Unfitness and termination of parental rights. The mother contends that some of the judge's findings of fact were erroneous,[11] and absent those findings, DCF did not meet its burden to prove parental unfitness by clear and convincing evidence. We disagree. Even assuming that some of the challenged findings were erroneous,[12] the remaining evidence of unfitness was overwhelming.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs,

---

[11] Specifically, the mother argues that the record did not support the judge's findings (1) that the mother's fourth child, who died shortly after birth, was found to have marijuana in [her] system, (2) that the two 51A reports dated July 18 and 29, 2019, made reference to the mother's mental health issues, (3) that DCF recommended that the mother enter a long-term inpatient treatment program at the outset of the case and that she failed to do so, and (4) that the mother was not present for twenty-five percent of visits with Pedro as of June 2020 and that she was "confrontational" on a visit in late June 2020.
[12] As discussed in note 3, supra, the judge's finding that the mother's fourth child, who died shortly after birth, was found to have marijuana in her system was erroneous.

affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). We give substantial deference to the judge's findings, which we do not disturb unless they are clearly erroneous. See Adoption of Jacques, supra at 606-607.

The mother's unfitness resulted from a "constellation of factors." Adoption of Greta, 431 Mass. 577, 588 (2000). The evidence supported the judge's finding that, inter alia, the mother was unfit to parent Pedro and her unfitness was likely to continue into the indefinite future to a near certitude, the mother failed to provide Pedro with adequate care, and the mother's substance abuse and mental illness history, which resulted in the adoption of three older children, continued to affect her in a way that made her unfit to parent and care for Pedro. See Adoption of Ramon, 41 Mass. App. Ct. 709, 717-718 (1996).

While the mother concedes that her history of problematic substance use played a significant role in the removal of her three older children, she argues that the judge relied on stale evidence of her substance use history by claiming that, from 2012 to 2019, she had been intoxicated only once. She also argues that her relapses between 2019 and 2021 do not establish that she was unfit to parent Pedro or that any unfitness is likely to continue. Contrary to her claims, the record reflects that the mother was intoxicated on multiple occasions between

8

2012 and 2018, at times to the point of being placed in protective custody. The mother's more recent behavior, delineated throughout the judge's comprehensive findings of fact and conclusions of law, further demonstrates the mother's ongoing pattern of problems with substance use. Viewed in combination with the mother's failure to consistently engage in services and other factors described above, the mother's argument is unavailing. "[A] judge [can] properly rely upon prior patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct in determining current unfitness." Adoption of Diane, 400 Mass. 196, 204 (1987).

As to termination of parental rights, the judge evaluated the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (v), (vi), (vii), (viii), and (xii) to be applicable. The record supports this determination. Moreover, as detailed above, in light of the mother's ongoing history of substance use issues, involvement with the criminal justice system, and inability and unwillingness to recognize and address her parental deficits, there was ample record evidence to support the judge's findings and determination that the mother was unfit and that termination of her parental rights was in the child's best interests.

2. Posttermination and postadoption visitation. We are likewise unpersuaded by the mother's argument that the judge

abused his discretion in ordering only two posttermination and postadoption visits between the mother and Pedro each year. Judges have broad discretion to order posttermination and postadoption visitation between the parent and child. See Adoption of Douglas, 473 Mass. 1024, 1027 (2016). A two-part inquiry informs a judge's decision to order visitation: "First, is visitation in the child's best interest? Second, in cases where a family is ready to adopt the child, is an order of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?" Adoption of Ilona, 459 Mass. 53, 63 (2011). To determine whether visitation is in the child's best interest, a judge should consider "whether there is 'a significant existing bond with the biological parent' whose rights have been terminated." Id. at 63-64, quoting Adoption of Vito, 431 Mass. 550, 563 (2000).

Here, the judge determined that posttermination and postadoption visitation between Pedro and the mother was in Pedro's best interest based on their emotional bond, despite the mother's inconsistency in confirming and attending visits. The judge properly sought to "balance the benefit to the child of an order of visitation that will provide assurance that the child will be able to maintain contact with [the mother], with the intrusion that an order imposes on the rights of the adoptive

10

parents." Adoption of Ilona, 459 Mass. at 64. We further note that "[t]he purpose of [posttermination and postadoption visitation] is not to strengthen the bonds between the child and his biological mother or father, but to assist the child as he negotiates, often at a very young age, the tortuous path from one family to another." Adoption of Vito, 431 Mass. at 564-565. On the record before us, we cannot say that the judge's decision to order two annual visits was "a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Decree affirmed.

By the Court (Neyman, Henry &
  Ditkoff, JJ.[13]),

Joseph F. Stanton

Clerk

Entered:  November 20, 2023.

_____

[13] The panelists are listed in order of seniority.