NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-705

ADOPTION OF DENISE (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After eleven-month old Amy was brought to the hospital suffering from significant facial bruising, medical personnel discovered that she had a fractured skull and several other serious injuries resulting from non-accidental trauma. The mother denied inflicting the injuries and claimed that she did not know who harmed Amy. Following a trial in the Juvenile Court, the judge issued decrees finding the mother unfit to parent Amy and her two other children, Denise and Erik;[2] that her unfitness was likely to continue into the indefinite future; and that it was in the children's best interests to terminate her

---

[1] Adoption of Amy and Adoption of Eric. The children's names are pseudonyms.

[2] Denise was born in 2018, Amy was born in 2020, and Erik was born in 2021.

parental rights.[3]  On appeal, the mother claims that (1) the judge committed prejudicial error by failing to conduct a colloquy concerning her waiver of her right to a Spanish-speaking interpreter; (2)  the judge improperly drew a negative inference when considering that some of the mother's visits with the children were virtual and not in-person; and (3) the Department of Children and Families (department) failed to demonstrate by clear and convincing evidence that she was unfit to assume parental responsibilities for the children.  We affirm.

Background.  We summarize the judge's detailed findings of fact and conclusions of law, reserving certain details for later discussion.  On January 17, 2021, a report was filed pursuant to G. L. c. 119, § 51A (51A report), alleging physical abuse of Amy, who was brought to the hospital by the mother and found to be covered in bruises.  Amy, who was almost one year old, had two black eyes and bruising and swelling in the facial area consistent with being punched in the head.  When interviewed by medical personnel, the mother denied that she or anyone else had

_____

[3] The judge also issued decrees terminating the parental rights of Denise's unidentified father and Erik's father, Frank, and neither is a party to this appeal.  The judge found Amy's father a fit parent and, consequently, he is not a party to this appeal.

physically abused Amy and said that Amy was in her crib all day. The mother stated that she noticed Amy's injuries two days prior but that her injuries had worsened. When hospital staff attempted to speak with the mother, she avoided eye contact, was on her telephone, and would not engage with the staff about Amy. Due to the severity of the injuries, Amy was transferred to Boston Children's Hospital by ambulance, where she was diagnosed with a skull fracture and multiple hemorrhages and contusions to her head. Amy also suffered injuries to the inside of her mouth, a torn upper-lip frenulum, and bruising to her thighs. The cause of the injuries was determined to be non-accidental trauma. The department was awarded emergency temporary custody of Amy and Denise on January 19, 2021.[4]

Earlier on January 17, the mother had been seen at the hospital emergency department as she was pregnant and experiencing abdominal pain. The mother was at the hospital for about eight hours and told the nurse that during that time the mother's boyfriend (hereafter, Frank [a pseudonym], the father of Erik) and his family had watched Amy. While the mother was awaiting treatment for her abdominal pain, she and Frank exchanged text messages, and Frank sent video recordings showing

_____

[4] On January 18, 2021, another 51A report was filed, alleging neglect of Amy and Denise by the mother and her boyfriend (the father of Erik).

3

Amy's injuries and telling the mother that Amy's facial swelling was worsening. The mother did not ask how Amy was injured, and when the mother returned home from the hospital, she did not immediately seek treatment for Amy but rather took a nap. When she woke up from her nap at around 8 P.M., the mother noticed Amy's worsening facial swelling, and then took Amy to the hospital. The mother did not ask anyone in the home how Amy had been injured.

When questioned by medical personnel as to how Amy was injured, the mother said she believed Amy might be having a reaction to a dose of Benadryl that the mother had given her earlier in the day. The mother also told medical staff that Amy might have a genetic blood disorder that the mother also has, causing Amy to bruise easily. A blood test concluded that Amy did not have the same blood disorder. Although the mother initially denied that Amy had fallen, she later reported that Amy could have been injured when, two weeks earlier, she fell off the bed while having her diaper changed. The mother said that despite the fall from the bed, Amy did not present with any bruising afterwards. All three explanations of Amy's injuries were ruled out by the medical professionals.

When interviewed by the department at the early stages of the investigation, the mother's statements were inconsistent

4

with what she told the hospital staff about when and how Amy was injured and who was responsible for her care. While the mother told the hospital staff that she noticed Amy's bruising two days earlier, she told the department investigator that she saw the bruising on January 17, the day she took Amy to the hospital. The mother told the investigator that she noticed the bruising but wasn't worried, because she believed it was caused by "rough play" between Amy and her two-year old sister Denise, although she never saw Denise hit Amy in the face. The mother also said she had seen Amy hit the mesh sides and metal poles of the crib. The department worker asked the mother if she understood the seriousness of the situation because Amy had suffered a fractured skull. The mother stated that she understood, but said she had no concerns that Frank would hurt Amy. The mother also provided inconsistent statements as to who cared for Amy in the mother's absence, ultimately saying she could not recall who watched the children.

After securing emergency custody of Amy and Denise, the department provided the mother with recommendations for services and an action plan; over time, the department crafted five additional revised action plans. Given her history with housing instability, the action plan required the mother to establish safe, appropriate, and stable housing. Additional tasks

5

included meeting monthly with the department, signing necessary releases, and -- significant to this case -- participating in parenting classes that were trauma informed. Throughout the three years that the department worked with the mother, she failed to engage with services in a meaningful way. For example, the mother was offered a shelter placement, where she could engage in services that would potentially reunite her with the children. The department social worker told the mother that she needed to work on assessing dangerous situations and informed the mother (who was pregnant with Erik), that if she continued to live with Frank, she risked losing custody of Erik upon birth. Instead of complying with the action plan and ending her relationship with Frank, the mother stayed with Frank and his family until they were evicted from the home in May 2021. Only then did the mother temporarily agree to the department's shelter plan, but she was noncompliant with the shelter rules by staying at Frank's house for multiple nights in a row, ultimately abandoning her placement to live with Frank again.[5]

---

[5] In July 2021, the mother gave birth to Erik. Erik was removed from mother's custody soon after birth, as she refused to end her relationship with Frank despite the department's concerns that Frank had injured Amy.

In September 2021, the mother reported to the department that she had relocated to Connecticut, but she could not provide the investigator any details about her current address.  The mother said she was living with a friend but claimed that she did not know the address, never noticed any street signs, and had no idea what town she was living in.  Suspicious that the mother was not being truthful about her living situation, especially since the social worker noticed that the mother was calling from a cell phone belonging to Frank's family member, the social worker made an unannounced visit to Frank's family home.  Upon arrival, the social worker saw the mother running from the porch to hide in a nearby cemetery.  The mother's action plan was updated, given the department's concern that the mother was not being truthful about her living situation or her continued relationship with Frank, and it required the mother to be truthful regarding her relationship with him.

A short time later, the mother became homeless but still did not engage with the department to find housing.  In January 2022, the mother moved to Puerto Rico and moved into the "family home" of Frank, who had also relocated to Puerto Rico.  After she relocated to Puerto Rico, the department referred the mother to programs and services in her area, but she did not engage in most of the recommended services.  In fact, the only service the

mother completed between January 2021, when Denise and Amy were removed from her custody, and the conclusion of the trial in November 2023, was a parenting group in Massachusetts and a parenting class in Puerto Rico, which lacked a necessary trauma-informed parenting component.

Discussion. 1. Use of the interpreter at trial. At trial, the mother was provided with a Spanish-speaking interpreter but requested that she be allowed to speak in English because she believed that the interpreter was not fully translating the essence of her testimony. Now on appeal, the mother claims that the judge erred by allowing her request to speak in English without first conducting a colloquy pursuant to G. L. c. 221C, § 3.

At the beginning of the trial, the judge informed the mother that all of her testimony should be in Spanish and that the interpreter would translate her testimony. Despite the judge's instruction and subsequent reminders to speak one language, on several occasions the mother alternated between speaking Spanish and English. At times in her testimony, the mother struggled to speak Spanish and, when she had difficulty finding the correct Spanish words, reverted to speaking English. For example, during her testimony on the first day of trial, the mother stopped speaking in Spanish and switched to English,

asking, "How do you say 'shaking' in Spanish?"  The judge told

the mother that, if she was unsure of the word in Spanish, she

would have to say it in English.  At all times when the mother

elected to speak in English, she had access to the services of

an interpreter.

Late in the afternoon of the first day of trial,[6] the

mother's counsel asked permission for the mother to testify in

English and, if she needed help, that she be allowed to utilize

the services of the interpreter.  The mother expressed concerns

that her answers in Spanish were not "exactly what she intended

them to be."  Counsel assured the judge that the mother

understood English but may need assistance from the interpreter

with certain vocabulary or if words were spoken too quickly.

The department objected, stating that it may create an

appealable issue.  While the judge was hearing from counsel, the

mother interjected, telling the judge that she testified in

English at her last court appearance with the interpreter

standing by.  The judge allowed the request over the

department's objections.  The judge also allowed mother's

counsel, on cross-examination, to clarify any inaccuracies or

---

[6] The trial transcript indicates that the mother's counsel made the request for the mother to speak in English at 3:43 P.M. on the first day of trial.

9

confusion over her testimony in Spanish during the first day of trial.

During the second and third day of trial, the mother testified in English and was provided an interpreter in the event she needed assistance or decided to resume her testimony in Spanish. During those two days, the mother answered hundreds of questions in English and only relied on the interpreter for assistance on six occasions. On the fourth day of trial, the judge informed the parties that he had become aware that the protocol for the Office of Language Access did not permit the interpreter to be used in a standby capacity or to translate single words. Rather, it was office policy to either provide complete translation services or none at all. In response, the judge told the mother's counsel that the mother would need to decide whether she would speak fully in Spanish or forgo the services of the interpreter. The mother chose to speak in Spanish and testified in Spanish during the remaining days of trial.

For the first time on appeal, the mother argues that it was error for the judge to allow her to testify in English during days two and three of trial without first conducting a colloquy and securing a formal waiver of her right to use an interpreter. The mother presses this argument even though she had the use of

10

the interpreter throughout the entire trial.  We review this claim for an abuse of discretion.  See Commonwealth v. Lee, 483 Mass. 531, 541 (2019).

Indisputably, non-English speakers in legal proceedings have a statutory right to the assistance of an interpreter.  See G. L. c. 221C, § 2.[7]  See also Lee, 483 Mass. at 540.  If a non-English speaker decides to forgo the use of an interpreter, a formal waiver on the record is required after the non-English speaker has consulted with counsel.  G. L. c. 221C, § 3 (a).  See Commonwealth v. Gautreaux, 458 Mass. 741, 753 (2011).  The party claiming a violation of G. L. c. 221C, § 2, bears the burden of proving that the affected party is a non-English speaker.  See Commonwealth v. Vargas, 475 Mass. 338, 355-356 (2016);  Crivello v. All-Pak Mach. Sys., Inc., 446 Mass. 729, 735 (2006).  Where a party has "some ability to understand and communicate" in English, the determination regarding the need for an interpreter is left to the wide discretion of the trial judge.  Commonwealth v. Turell, 6 Mass. App. Ct. 937, 938 (1978), quoting United States v. Carrion, 488 F.2d 12, 14 (1st Cir. 1973), cert. denied, 416 U.S. 907 (1974).

---

[7] A non-English speaker is defined as a "person who cannot speak or understand, or has difficulty in speaking or understanding, the English language, because he [or she] uses only or primarily a spoken language other than English."  G. L. c. 221C, § 1.

11

We are not persuaded by the mother's claim that the judge erred in failing to conduct a formal colloquy on the record to ensure that the mother's waiver of the interpreter was knowing and voluntary. To show that a colloquy was required, the mother must first demonstrate that she is a non-English speaker and entitled to an interpreter under G. L. c. 221C, § 2. She has not done so. The mother told the trial judge that she understood English. Also, according to the mother, she testified in English at the 2021 temporary custody hearing and only used the interpreter in a standby capacity. The mother's social worker spoke English to her and never used an interpreter. In 2023, the department's investigator noted that "[m]other is fluent in English," and the manager of the shelter also reported that the mother communicated in English. When the mother participated in virtual visits with the children, her primary language was English.

At trial, counsel for the mother told the judge that the mother understood English and only needed help "sometimes." The fact that the mother understood and took issue with the accuracy of the interpreter's translation further demonstrated her proficiency with the English language. We have reviewed the record and observe that the mother answered hundreds of questions in English with clear, responsive answers. In fact,

12

when the mother did rely on the interpreter, most often she needed the interpreter's help to find a word in Spanish -- not English.  The mother's proficiency is not belied by the fact that there were a few instances in which she needed clarification, and, accordingly, she has not shown that she was entitled to an interpreter.  Where the mother has not established that she is a non-English speaker, we cannot say that the judge abused his discretion in failing to obtain a formal waiver of the interpreter before the mother testified in English.

Furthermore, even if we were persuaded that the mother met the requirements under G. L. c. 221C, § 2, as a non-English speaker, her claim that the judge erred by failing to conduct a formal colloquy and waiver on the record nevertheless fails.  It is undisputed that the mother had access to the interpreter standing by while she testified in English.  This is not a case in which the mother decided to forgo the use of an interpreter altogether.

When confronted with the mother's concern that the interpreter was not providing the essence of her testimony, the judge showed great sensitivity, explaining to the mother that she could speak in whatever language she was most comfortable with, and the mother could utilize the interpreter whenever it

13

was necessary.  The issue of potential waiver of the assistance of an interpreter did not arise until the fourth day of trial, when the interpreter informed the judge that acting in a standby capacity was against office policy.  Then, the judge clearly informed the mother's counsel that the mother needed to decide whether she would speak in Spanish and fully utilize the services of the interpreter or whether she would waive the services of the interpreter.  The mother chose to speak in Spanish for the remainder of the trial and utilize the interpreter.  Thus, there was no need for the judge to formally conduct a waiver on the record.

2.  Mother's virtual visits with children.  As noted above, the mother decided to relocate to Puerto Rico and live with Frank's family.  As a result, from January 2022 until her trial in September 2023, the only visitation with her children was through virtual visits.  The mother claims that the judge erred by drawing a negative inference from the fact that her visits with the children were virtual.  The mother's reliance on Thaddeus v. Secretary of Executive Office of Health & Human Serv., 101 Mass. App. Ct. 413, 416 (2022), and the department's previous interim policy on virtual visits is misplaced because the mother's lack of in-person visitation was not due to the COVID-19 pandemic.  In addition, the judge found that the mother

14

was compliant with her action plan regarding visitation with the children, while noting that the mother chose virtual visits over in-person visits by moving to Puerto Rico while the children remained in Massachusetts. It was proper for the judge to consider that these visits were not in-person, as we recognized in Thaddeus the "strong presumption" that "visits between a parent and a child in department custody are to be in person." Id. at 422. "The statutory goal is to reunite the family, and in-person visitation is important to that goal." Id. In short, it is undeniable that in-person contact provides a child with benefits that virtual contact cannot, and, although virtual visits can supplement in-person visits, they are not on equal footing as far as the benefit to the child. There was no error.

3. Termination of parental rights. When faced with a care and protection proceeding that involves the termination of parental rights, the judge must find by clear and convincing evidence that the parent is unfit, and that the unfitness will continue into the indefinite future. See Adoption of Lisette, 93 Mass. App. Ct. 284, 296 (2018). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008). In care and protection cases, the judge's

15

subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous.  See Custody of Eleanor, 414 Mass. 795, 799 (1993); Care & Protection of Laura, 414 Mass. 788, 793 (1993).  Our review on appeal gives "substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).

The judge's finding of unfitness were primarily focused on the mother's failure to protect the children from future abuse and the mother's failure to address her parental shortcomings by participating in appropriate services outlined in her action plans.  There was ample record evidence to support the judge's finding of unfitness. The mother did not comprehend the severe nature of Amy's injuries, offering various and inconsistent accounts of how Amy may have been injured.  An important requirement of her action plan was for the mother to engage in counselling to understand the impact of trauma on her children. She failed to participate in this type of counselling as well as many other recommendations to improve her parental skills. Moreover, the mother refused to accept the possibility that

16

Frank had injured Amy, never once asking him what had happened to cause Amy's skull to be fractured while she was in his care. Even at trial, the mother still maintained that she was not worried about the children's safety around Frank and did not acknowledge that Amy's injuries were the result of non-accidental trauma.[8] The mother's continued refusal or inability to consider that Frank may have injured Amy coupled with her lack of participation in specific parenting classes underscores her inability to protect the children from future harm by avoiding dangerous situations that would potentially jeopardize their health and safety. See Adoption of Lorna, 46 Mass. App. Ct. 134, 140-141 (1999). See also Adoption of Yalena, 100 Mass. App. Ct. at 552.

The judge's findings that the mother lacked insight into her own trauma or the children's trauma are also supported by the record. At trial, the mother was unable to express what, if anything, she learned from the two parenting groups that she attended. And when asked what she would have done differently to prevent Amy's injuries, the mother responded that she "never

---

[8] While ignoring the potential harm inflicted by Frank, the mother provided various inconsistent explanations of how Amy was harmed, including accusing, without witnessing, her two-year old child (Denise) of causing the injuries by playing roughly.

17

would have come to Massachusetts and [she] never would have left the children with anybody."

The record also supports the judge's finding that the mother had not sufficiently addressed other parental deficits, most notably her unwillingness to end her relationship with Frank. The mother was unable or unwilling to establish safe, appropriate, and suitable housing so that she could engage in services to be reunited with the children. Instead, the mother chose to stay with Frank and his family, despite the concerns expressed by the department that the mother needed to address her dangerous living situation. The evidence also supported the judge's concern that the mother was not being truthful when she told the department and the judge that she had ended her relationship with Frank. See Adoption of Larry, 434 Mass. 456, 469-470 (2001).

While the mother did make some strides in her self-development, such as obtaining health insurance and attending (but not completing) Job Corps, they were simply not enough.[9]

_____

[9] To the extent that the mother contends that her failure to participate in counseling was due to the department's failure to make reasonable efforts, this argument is deemed waived as the mother failed to raise it in the Juvenile Court. See Care & Protection of Rashida, 488 Mass. 217, 230 (2021), S.C., 489 Mass. 128 (2022), quoting Adoption of Gregory, 434 Mass. 117, 124 (2001).

Even when the mother made a last-minute effort to engage in counselling prior to trial, she failed to sign the necessary release forms so that her attendance in individual counselling could be verified.  The judge properly concluded, based on clear and convincing evidence, that the unfitness of the mother was likely to continue into the indefinite future as the mother had shown a long track record of lack of progress.  See Adoption of Ramon, 41 Mass. App. Ct. 709, 718 (1996).

Decrees affirmed.

By the Court (Blake, C.J.,
 Shin & Walsh, JJ.[10]),

*Paul Little*

Clerk

Entered:  May 23, 2025.

---

[10] The panelists are listed in order of seniority.