NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1451                                          Appeals Court

CARE AND PROTECTION OF VICK.[1]


No. 15-P-1451.

Plymouth.     May 10, 2016. - July 13, 2016.

Present:  Cypher, Blake, & Henry, JJ.


Parent and Child, Care and protection of minor, Custody of
     minor, Interference with parental rights.  Minor, Care and
     protection, Custody.



     Petition filed in the Plymouth County Division of the
Juvenile Court Department on November 25, 2013.

     The case was heard by John P. Corbett, J.


     Karen O. Young for the mother.
     Rizwanul Huda for the child.
     Sookyoung Shin, Assistant Attorney General, for Department
of Children and Families.
     Dennis M. Toomey for the father.


     BLAKE, J.  A judge of the Juvenile Court found that the

child was in need of care and protection, that the mother was

unfit to assume parental responsibility, and that the unfitness

_____

     [1] A pseudonym.

was likely to continue into the indefinite future. On appeal, the mother challenges the sufficiency of the evidence supporting the judge's conclusion that she was unfit, contending that the evidence failed to establish a nexus between her parenting and a showing of harm to the child. She also claims that the judge did not conduct an evenhanded assessment of the evidence, and ignored the child's preference to live with his mother. The child joins in these arguments. We affirm on the basis that the mother was unfit to assume parental responsibility due to neglect of the child.

1. Background. We summarize the relevant facts and procedural history as set forth in the judge's decision and as supported by the record, reserving other facts for later discussion. The parents met in high school and, shortly thereafter, the mother became pregnant. The child was born in February, 2002. Immediately after his birth, and for the next four and one-half years, the father was the child's primary caretaker; during that time period, the father and child lived with the father's mother. When the father lost his job, he placed the child in the mother's care. In 2008, the father moved to Georgia, where he has extended family, because he was unable to find employment in Massachusetts. Despite the distance, the father maintained contact with the child's schools

and medical providers.  From 2008 to 2013, the child spent most of his summers with the father in Georgia.

In 2013, the mother resided in Brockton with the child, her sister (aunt), and her father (grandfather).  She also had a residence in Stoughton.  In November of that year, the police responded to the Brockton home after the aunt fell in the shower.  Following that incident, the Department of Children and Families (DCF) received three reports, filed pursuant to G. L. c. 119, § 51A (51A reports), each alleging the neglect of the child by the mother.  The primary concerns expressed were the condition of the mother's Brockton home, the lack of food available, and the exposure of the child to drug abuse.  The 51A reports were investigated and substantiated.

After the mother failed to cooperate or provide access to the Brockton home, on November 25, 2013, DCF filed a care and protection petition pursuant to G. L. c. 119, § 24, alleging that the child was in need of care and protection.  On December 5, 2013, a stipulation of conditional custody was approved allowing the mother to have continuing custody of the child.[2]  On

---

[2] The conditions, agreed to by the mother, were that DCF was to have unfettered access to the child at home or at school; she would cooperate with DCF to create a service plan; the child's physical, medical, educational, and psychological needs would be met, including the maintenance of "a safe and clean home environment"; the mother would remain drug and alcohol free; and she would meet with her DCF social worker and comply with the assessment process.

February 10, 2015, DCF removed the child following the mother's failure to comply with her DCF plan. Following a trial, the judge found the mother unfit to parent the child and the father fit to assume parental responsibility, and awarded custody of the child to the father pending the outcome of a home study of the father's residence.[3] This appeal followed.

2. Standard of review. In care and protection cases, the judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous. See Care & Protection of Laura, 414 Mass. 788, 793 (1993); Custody of Eleanor, 414 Mass. 795, 799 (1993). "Taken together, these findings must then prove clearly and convincingly that the [parent is] currently unfit to provide for the welfare and best interests of [the child]." Adoption of Quentin, 424 Mass. 882, 886 (1997). Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age. Adoption of Mary, 414 Mass. 705, 711 (1993).

3. The mother's unfitness. The mother claims that DCF failed to prove that her parenting placed the child at serious risk of harm "from abuse, neglect, or other activity harmful to the child." Care & Protection of Bruce, 44 Mass. App. Ct. 758,

---

[3] At the time of trial, the father was employed and living in Georgia with his wife and stepdaughter. The parties do not challenge the father's fitness on appeal.

761 (1998). Specifically, she claims that the condition of the Brockton home, coupled with her failure to cooperate with DCF, did not endanger the child to the degree necessary to demonstrate unfitness. We disagree.

The cleanliness of a parent's home is an appropriate factor for consideration in determination of that parent's fitness. See Care & Protection of Three Minors, 392 Mass. 704, 713 & n.11 (1984). Here, the December 3, 2013, stipulation of conditional custody clearly directed the mother as to the actions she needed to take to maintain custody of the child, including maintaining a safe and clean home environment. Yet during a visit to the Brockton home on March 18, 2014, a Juvenile Court probation officer found the home to be in a "deplorable" condition, with dirty rugs and refrigerator, a blackened stove, and a toilet that was dirty with brown water. On a return visit, the probation officer found the conditions had not improved, which prompted a judge of the Juvenile Court (not the trial judge) to visit the home. That judge deemed the home unsafe for the child and awarded custody of the child to DCF in April, 2014. In an effort to regain custody of the child, the mother eventually allowed DCF access to the Stoughton home, which was deemed safe. The mother's service plan required that the child remain in the Stoughton home, and prohibited his sleeping at the Brockton home due to safety concerns. At subsequent visits to the Stoughton

home, the probation officer and a social worker were left with the impression that the house had not been lived in and was essentially abandoned.[4] After a meeting at the school with the child, it was clear that both he and the mother were living in the Brockton home. The grandfather confirmed this, but continued to deny the social worker access to the Brockton home. When DCF removed the child on February 10, 2015, the Brockton home had no heat, minimal lighting, a strong smell of animals and cigarettes, and piles of trash and dirt on the floor. Throughout the DCF investigation, multiple professionals[5] viewed the Brockton home and all agreed that it was unsuitable for the child. At trial, the mother nevertheless insisted that she had adequately provided for the child. The judge was free to reject her testimony, which was not supported by other evidence.[6] In

---

[4] The social worker observed mail piled up outside the mailbox, minimal food in the refrigerator, a strong odor of trash, and no bed for the mother. At a second visit, the mail was again piled up, snow had not been shoveled, and a window was boarded up. The mother confirmed the Stoughton home did not have electricity.

[5] DCF social workers, Brockton police officers, a Juvenile Court probation officer, and a judge of the Juvenile Court.

[6] After the child's removal, a DCF social worker visited the mother in the Stoughton home. The mother was unable to produce a lease or utility bill to demonstrate that she was living there. Despite a judgment against her in excess of $7,800 for unpaid rent owed to the Stoughton Housing Authority, the mother denied being evicted from that home. She claimed to have secured a new apartment in Brockton, but could not produce a lease.

sum, despite numerous opportunities to rectify the living situation at the Brockton home, the mother failed to maintain safe and sanitary conditions for the child.[7]

Likewise, "[e]vidence of parents' refusal to cooperate with [DCF], including failure to maintain service plans . . . , is relevant to the determination of unfitness." Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005). Here, the mother rejected all attempts by DCF to work with her to improve her situation. She did not return telephone calls and prevented access to the home. She declined to work with a parent aide and refused all mental health services, despite having expressed "violent thoughts" to a social worker. She refused to comply with her service plan tasks. Even though DCF granted her substantial flexibility, the mother responded with "defiance."[8]

The mother has also made poor choices regarding caretakers for the child. The aunt, who provided much of the child care,

---

[7] The mother correctly observes that poverty alone cannot support a finding of unfitness. Custody of a Minor, 389 Mass. 755, 766 (1983). Here, however, the judge did not find that poverty was the cause of the conditions in the Brockton home, but rather the mother's poor judgment. Moreover, the mother earned $1,350 biweekly, plus a monthly commission that ranged from $1,000 to $3,000, income well outside the threshold for indigency in the Commonwealth. See generally G. L. c. 261, § 27A(b) (defining indigent in terms of inability to pay court filing fees).

[8] In response to the allegations set forth in the last of the three 51A reports, the mother responded, "Game on!"

had outstanding warrants.[9]  Prior to trial, the mother indicated her plan was for an uncle to care for the child while she is at work.  The uncle contended he had no legal involvement, yet his criminal offender record information was "very concerning" to DCF.  Finally, after removal from her care, the mother only visited with the child once prior to trial.  See Adoption of Darla, 56 Mass. App. Ct. 519, 522 (2002) (failure to visit child was relevant to parental unfitness).

The child also has behavioral and educational issues, and the judge concluded that the mother was unwilling or unable "to comprehend the impact of [her] behaviors" on the child.[10]  The mother insists the child has no issues at school, and as the judge concluded, "has consistently and repeatedly refused to cooperate with [DCF]," which was physically and emotionally detrimental to the child.  The mother's ongoing refusal to acknowledge her shortcomings and to participate in DCF remedial programs further supports the inference that her parental deficiencies will remain unaddressed.

---

[9] The judge's finding that it was the mother who had outstanding warrants is clearly erroneous.  The error is harmless, however, as the judge neither relied on, nor mentioned, any criminal history of the mother in his conclusions of law.  See Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003).

[10] The court investigator's report indicates that the child had multiple school suspensions and detentions, and was frequently tardy.

Under these circumstances, where the child has been remarkably resilient despite his neglect by the mother, the judge did not "need to wait for inevitable disaster to happen" before acting in the child's best interests. Adoption of Katharine, 42 Mass. App. Ct. 25, 32 (1997). See Custody of a Minor (No. 2), 378 Mass. 712, 714 (1979) ("the State's interest in protecting children from suffering harm at the hands of their parents may properly be preventive as well as remedial"); Care & Protection of Bruce, 44 Mass. App. Ct. at 761. Where the child was surviving in deplorable conditions, with a mother who obstinately and defiantly refused to allow DCF access to the home, the judge's conclusion that the child was "at near certain risk of future harm" was supported by clear and convincing evidence.

4. Other issues. a Mother's mental health. Contrary to the assertions of the mother and the child on appeal, the judge's determination of unfitness was in no way tied to his finding that she had an undiagnosed mental illness. Rather, the mother's over-all demeanor, including her defensiveness, refusal to accept services, and her court room outburst,[11] was one of several factors that contributed to her parental shortcomings.

_____

[11] On cross-examination, the mother "became hysterical, screaming, and falling to the courtroom floor." The judge categorized this response as evidence of an "undiagnosed and untreated mental illness."

The determination whether the mother suffers from a mental illness was hamstrung by the mother's refusal to be evaluated and accept mental health services. Regardless, the mother's inability to provide for the child's over-all welfare and best interests was the central determination of her unfitness. See Adoption of Eduardo, 57 Mass. App. Ct. 278, 283 (2003).

b. Assessment of the evidence. The judge's findings are both "specific and detailed," demonstrating, as we require, "that close attention was given to the evidence." Adoption of Helen, 429 Mass. 856, 859 (1999). Those findings, which reflect endangerment and neglect of the child, provide clear and convincing evidence of the mother's unfitness. The mother's claim that the judge's pretrial comments indicate that he "prejudged the case" is unavailing. See Adoption of Tia, 73 Mass. App. Ct. 115, 119-124 (2008) (judge's comments, although "troubling," did not require reversal where evidence "substantially supported the judge's findings and conclusions").

c. Child's preference. At trial, counsel for the child argued that the mother was unfit and that the child should not be returned to her care. With new counsel on appeal, the child now contends the mother is fit and that his wishes were not properly considered. A judge should consider the wishes of the child in making custodial determinations, and those wishes "are entitled to weight in custody proceedings." Care & Protection

of Georgette, 439 Mass. 28, 36 (2003).  The child's wishes, however, are neither decisive nor outcome dispositive, ibid., and must be considered against the backdrop of the mother's unfitness, which has been shown here by clear and convincing evidence.  See Adoption of Rhona, 63 Mass. App. Ct. at 126.

5.  Conclusion.  Collectively, the mother's utter failure to accept services, the unsafe and unsanitary conditions of the home, and her lack of judgment concerning the child's needs clearly supported the determination of unfitness.

Judgment affirmed.