Following trial in the Juvenile Court, a judge found the mother unfit to parent the child and placed him in the permanent custody of the Department of Children and Families (department).[3] See G. L. c. 119, § 26. The judge provided for the child's visitation with the mother at the department's discretion.[4] On appeal, the mother primarily contends that two of the judge's factual findings are clearly erroneous, and the finding of the mother's unfitness is not supported by clear and convincing evidence. For the reasons that follow, we affirm.[5]
Background. We summarize the judge's findings of fact, supplemented where necessary by uncontradicted evidence from the record. The child was sixteen years old at the time of trial. He has been diagnosed with cerebral palsy, autism, epilepsy, cortical vision impairment, developmental delays, and flat feet. He is nonverbal and communicates using a number of methods, including modified sign language and picture icons. The child takes medication for his seizure disorder. His developmental delays necessitate physical, speech, and occupational therapy, as well as applied behavioral analysis. Despite the child's medical complexity, he has developed a bond with the mother and, until his removal from her custody in 2015, had always resided with her.
The department became involved in this case in September, 2014, after mandated reporters filed two G. L. c. 119, § 51A, reports (51A reports). The 51A report dated September 25, 2014, alleged educational neglect by the mother based on the child's absence from school since September 16, 2014, and a long history of abrupt changes and gaps in the child's education due to the mother's "distaste for schools and providers." Following an investigation pursuant to G. L. c. 119, § 51B, the department found that the allegations of educational neglect were supported.[6] Undeterred by this finding, or by warnings that failure to send the child back to school would result in a care and protection petition, the mother continued to hold the child out of school through October and November. During this time, the mother, who had several criminal convictions and repeated involvement with the criminal justice system,[7] was often verbally hostile toward department workers.[8] On November 4, 2014, the department received a call from the child's neurologist "expressing concerns for [the child's] safety due to reports that [the] [m]other was physically abusive towards [the child]." It was reported to the department that in November of 2014, the mother "threatened the [child's] neurologist stating that if he did not do what she wanted, she would not give her son his [seizure] medication." After the doctor refused, the mother left the appointment without allowing the doctor to evaluate the child.[9]
On November 25, 2014, the department filed a care and protection petition. Following a preliminary hearing, the Juvenile Court judge granted the mother temporary custody, appointed a guardian ad litem (GAL) for the child, and ordered the mother to cooperate with the department and send the child back to school. The mother initially complied with the order but quickly removed the child from school again in early December, 2014. Although her cited concerns with the school's services were addressed, she refused to send the child back to school. Eventually, after a home visit with the department in mid-December of 2014, the mother sent the child back to school. In January, 2015, the mother received her first service plan from the department. The plan required her to, inter alia, send the child to school daily, meet with the department once a month, refrain from aggressive behavior with service providers, engage in therapy, and ensure that the child is up to date with his medical care.
Over the next several months, the mother repeatedly violated the terms of her service plan.[10] In early January of 2015, she verbally accosted employees of the child's school, which led the school to serve her with a "no trespass" order. On the heels of this incident, she began to withhold the child from school yet again. Although the mother later agreed, following another hearing in March, to work with the department to facilitate a neuropsychological evaluation for the child and to find an alternative school placement, she subsequently failed to do either.[11] Ultimately, in August, 2015, the child was placed in the temporary custody of the department because the mother continued to withhold the child from school.[12] From January to August of 2015, the mother frequently refused to meet with department social workers and engaged in abusive communications with both department personnel and service providers.[13]
After being removed from the father's custody, see note 11, supra, the child was enrolled at the May Institute Residential School (May Center) in late September. When the child arrived, his medications were below therapeutic levels, and the May Center was concerned that they had not been administered properly prior to his placement.[14] After removal, the mother's behavior initially improved, but she soon reverted to her old pattern of disrupting the child's services. On one occasion, she aggressively shouted department workers off her property. Her interactions with the May Center staff became so inappropriate that, by April, 2016, the center felt compelled to discontinue on-site visits due to safety concerns.[15] Based on this type of behavior, multiple witnesses-credited by the judge-testified that the mother is a hindrance to the child's education and care.[16]
Discussion. "In care and protection cases, the judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). A subsidiary factual finding is "clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Custody of Eleanor, 414 Mass. 795, 799 (1993) (quotation omitted). "Taken together, these findings must then prove clearly and convincingly that the [parent is] currently unfit to provide for the welfare and best interests of [the child]." Care & Protection of Vick, supra (quotation omitted).
A. Findings of fact. The mother contends that two of the judge's subsidiary factual findings are unsupported by the evidence. Specifically, she disputes the findings that the child "had problems with self-care" when he arrived at the May Center, and that the child has made "tremendous progress" since his enrollment there. Neither finding is clearly erroneous.
The record indicates that both findings are supported by the evidence, including witness testimony explicitly credited by the judge.[17] See Custody of Two Minors, 396 Mass. 610, 618 (1986) ("[T]he judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference"). The mother's argument amounts to a claim that the judge improperly weighed the evidence. See Adoption of Don, 435 Mass. 158, 166 (2001). Contrary to her contention, even "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Care & Protection of Olga, 57 Mass. App. Ct. 821, 824 n.3 (2003) (quotation omitted). Thus, there is no indication that a mistake was committed as to either of these findings, see Custody of Eleanor, supra, and we therefore must accept them. See Custody of Vick, supra.
B. Unfitness. The mother next contends that there is insufficient evidence to support the judge's ultimate finding of unfitness. We disagree. The judge's specific and detailed findings demonstrate, clearly and convincingly, that the mother is unfit and that the child's best interests will be served in the custody of the department.
A parent is considered unfit if they have "grievous shortcomings or handicaps that put the child's welfare much at hazard." Care & Protection of Thomasina, 75 Mass. App. Ct. 563, 576 (2009) (quotation omitted). This determination is highly fact specific, and "[t]he specialized needs of a particular child combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness." Ibid. (quotation omitted). In this case, the record demonstrates that the mother is either unwilling or unable to provide for the child's specialized medical and educational needs.
It is well established that a parent's failure to obtain appropriate medical care for his or her child is a relevant factor in determining unfitness. See Adoption of Ramon, 41 Mass. App. Ct. 709, 717 (1996) ; Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008). In this case, the mother's neglect of the child's medical needs put the child "much at hazard." Care & Protection of Thomasina, supra. Indeed, the record reflects that the mother refused to let the child be examined during a neurology appointment and stopped bringing him to medical appointments altogether when she did not get her way; continued to cancel appointments even after telling a doctor that the child was having more seizures; allowed the child to fall below therapeutic levels of his seizure medication; and declined to sign off on a neuropsychological evaluation without justification. Although the evidence does not establish that the mother's behavior ever caused a medical emergency, courts need not "wait for inevitable disaster to happen" to protect a child. Adoption of Katharine, 42 Mass. App. Ct. 25, 32 (1997).
This court has also explained that the failure to meet a child's educational needs is relevant to the unfitness calculus. See Care & Protection of Lillith, 61 Mass. App. Ct. 132, 135 (2004) (noting relevance of mother's failure to send child to school and her inability to understand negative effects of such failure on child). Here, although the child had an individualized education plan (IEP) indicating that he was capable of benefiting from an education, the mother's disruptions caused him to miss over a year's worth of school, thereby putting his developmental growth at risk.[18] See ibid.
Additionally, apart from the medical and educational neglect, there are several other factors that support the judge's finding of present and future unfitness in this case. Those factors include the mother's repeated failure to comply with her service plan, see Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005) ; her inability to work with professionals to face her considerable parenting challenges, see Care & Protection of Thomasina, supra at 575 n.22; her "[v]iolence of temper," Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973) ; and her criminal convictions, see Care & Protection of Frank, 409 Mass. 492, 495 (1991). Finally, the judge was also entitled to take into account the mother's undiagnosed mental health issues, her refusal to undergo a full mental health evaluation, and her refusal to engage in therapy. See generally Adoption of Carla, 416 Mass. 510, 519 (1993).
All of these factors, taken together, clearly and convincingly demonstrate that the mother is currently unfit to parent the child. Furthermore, the evidence that the child has been brought medically up-to-date since his removal, and that he has made tremendous progress at the May Center, establishes that his interests will be best served in the custody of the department going forward.[19] ,[20]
Judgment affirmed.

The judge also found the father to be unavailable. He is not a party to this appeal.

Following oral argument, the department submitted a letter pursuant to Mass.R.A.P. 16(l), as amended, 386 Mass. 1247 (1982), in which it represented that it is providing the mother an opportunity for visitation with the child on a twice-monthly basis.

Although the judge found the mother unfit and adjudicated the child in need of care and protection, he also found that it is not in the child's best interests to terminate the mother's parental rights.

During the investigation, the mother admitted that the child had been in several different schools since the age of three due to her concern with the services he was receiving, and that she was currently holding him out of school due to such concern. A review of the child's educational history shows that he has attended more than six schools since 2004 and, in that time, has missed a year of school in total without any valid justification.

The judge found that the mother's criminal record "illustrates [her] erratic antagonist behavior." The mother had been charged with criminal harassment, harassing telephone calls, assault by means of a dangerous weapon, threatening to commit a crime, stalking, intimidation, malicious destruction of property, trespassing, disturbing school assembly, and three violations of active abuse prevention orders. She had numerous abuse prevention orders filed against her and had violated those orders at least three times.

The judge found that since the inception of the department's involvement, the mother presented with inappropriate and aggressive behavior, used vulgar language, made racist remarks, and was unable to curb this behavior around the child. The mother also directed her inappropriate behavior toward the child, referring to him as a "wigger" among other derogatory names.

The judge found that in addition to the mother's verbal abuse of medical staff, she was "willing to allow [the child's] medical needs to go unmet if she does not get her way."

The mother never complied with the requirement that she seek a psychological evaluation.

Despite the GAL's efforts to schedule the neuropsychological evaluation, the mother refused to "sign off" on it. Consequently, the child did not receive an updated evaluation until after his removal from the mother's custody. Further, although the mother was offered ten private school placements, she rejected each one, expressing unrealistic expectations in the process. However, "[a]t some point [the mother] brought [the child] to school for specialized service only."

At the time of his removal, the child was placed in the physical custody of the father. However, the child was removed from the father's care on or about September 22, 2015, when it was discovered that he had conspired with the mother, from the day he received custody, to allow the child to stay at the mother's home.

In March and April of 2015, the mother refused to schedule home visits with department social workers. Additionally, at various times, she sent inappropriate electronic mail messages (e-mails) and made inappropriate telephone calls to both department workers and service providers. The judge found that her behavior caused school staff to feel unsafe.

One of the child's former pediatricians stated that, based on the number of prescription refills requested by the mother, the child was not regularly provided with his seizure medication. Further, at the time of enrollment, the child was behind on his medical appointments, as there had been a lack of regular check-ups with his pediatrician and neurologist. Indeed, one of the child's doctors stated in July, 2015, that the child had not seen his pediatrician since October, 2014, or his neurologist since November, 2014. This doctor also explained that the mother had continued to cancel appointments even after calling to tell him that the child was experiencing more seizures than usual.

The mother had interacted inappropriately with the May Center staff on many occasions prior to April, 2016, but the final decision to discontinue on-site visits was prompted by an incident in which she made obscene gestures at a staff member, yelled at her, and blocked her from getting into an elevator with the child.

Both the GAL and the mother's contact person at the May Center agreed that the mother's behavior was a hindrance to the child's care and education.

As to the first finding, the director of family services at the May Center testified that upon arrival the child "had a lot of problems with his adaptive skills," was unable to feed himself with utensils, and required substantial assistance in the bathroom, which has since decreased. As to the second finding, both the director of family services and the GAL testified that the child had made progress in numerous areas.

The mother argues that, while the child was being held out of school, he was actually receiving equivalent educational benefits at home. However, we find that assertion unpersuasive for two reasons: (1) she provides no evidence to support it; and (2) it directly conflicts with the judge's findings on self-care and progress at the May Center, which, as discussed above, is supported by the record.

The mother also argues that there was a "functional application" of G. L. c. 76, § 1, here that excused the child's absence from school. See G. L. c. 76, § 1 ("attendance shall not be required of a child whose physical or mental condition" would "render attendance inexpedient or impracticable subject to the provisions of section three of chapter seventy-one B"). We discern no mention of this argument below and, therefore, it is waived. See Adoption of Mary, 414 Mass. 705, 712 (1993). Even assuming, arguendo, that this contention is properly before us, the mother fails to cite any evidence that the child's condition renders school attendance "inexpedient or impracticable."

To the extent that the mother makes other arguments that we do not address, they have not been overlooked. "We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).