NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-156

ADOPTION OF PALOMA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Juvenile Court judge issued decrees finding the mother and the father unfit to parent their daughter (child) and terminating their parental rights.  The mother appeals, arguing that the Department of Children and Families (department) failed to meet its burden of proving her unfitness.[2]  We affirm.

Background.  The mother has a lengthy history with the department.  She lost custody of her eldest child (son) after several reports under G. L. c. 119, § 51A (§ 51A reports), were filed against her and supported by the department.  In June 2014 a § 51A report was filed alleging that the mother's then boyfriend threw the son, only one month old, at the mother and

_____

[1] A pseudonym.

[2] The father filed a notice of appeal but did not file a brief or otherwise participate in the appeal.

then hit her across the face in the son's presence. In September 2014 a second § 51A report was filed alleging that the mother smoked marijuana while caring for the son, left home in the middle of the night without securing a caregiver for him, yelled at him, and practiced unsafe sleeping practices, including co-sleeping. After finding these allegations to be supported, the department obtained temporary custody of the son.

Custody was returned to the mother in September 2015, but a month later several additional § 51A reports were filed alleging that the mother smoked marijuana while caring for the son, left him in the care of her mother (maternal grandmother) for long stretches of time, was verbally abusive toward family members, and left the maternal grandmother's home and took the son to Boston without food, clothing, or a place to stay. During its investigation the department learned that the mother was seeing a therapist and was diagnosed with bipolar disorder, but refused to take her prescribed medication and instead self-medicated with marijuana. The department supported the reports and opened a case for services.

After the mother refused to engage with services, the maternal grandmother obtained custody of the son in October 2015. By the time the case was closed in July 2016, the mother had not met with the department consistently for over six months and had failed to update her contact information, obtain stable

2

housing, complete a substance abuse evaluation, or follow through with recommendations from her neuropsychological evaluation.  The maternal grandmother refused to allow the mother to visit the son until the mother engaged in treatment to address her "aggressive behaviors."

The mother became involved with the department again in October 2018 when she gave birth to twin girls, including the child.  A § 51A report was filed alleging that the mother tested positive at delivery for tetrahydrocannabinol and that the twins' meconium was positive for marijuana, which was consistent with maternal drug use during the last four to five months of pregnancy.  The mother reported to a hospital social worker that she was self-medicating her depression and anxiety with unprescribed marijuana.  Later, the department learned that the mother had tested positive for marijuana at her obstetrician's office in April, June, and August of 2018.  The mother was told at the time that her marijuana use could cause low birth weight.

While at the hospital after the delivery, the mother reported that she and the father were living together in Taunton.  After initial phone calls with the parents, the department attempted to schedule a home visit, but neither parent returned the department's calls.  A social worker made an unannounced visit to the Taunton apartment but found no evidence that the family lived there.  When the mother finally responded

3

to the department's numerous calls, she claimed that the family was living at the Taunton apartment but had moved out temporarily because the ceiling caved in. She further stated that the family was staying with a friend in Carver but refused to disclose the address.

On October 26, 2018, the mother met with a social worker outside of the maternal grandmother's home. The mother admitted to the social worker that she smoked marijuana to cope with her anxiety and depression and reported that her "anxiety [was] through the roof" and she was "more depressed." The social worker was able to schedule a visit at the friend's home in Carver where the family was temporarily living. There, the social worker observed unclean conditions, including full trash bags against the wall, objects strewn over the floor, and piles of trash swept on the floor but not yet disposed of. The friend reported that the family stayed with her three to four nights per week and that she believed they were also living in Taunton, Middleboro, and Attleboro. The mother denied this and claimed that the friend's home was her only residence.

The next morning, November 7, 2018, the department learned that the child's twin sister (twin) died during the night. The parents had arrived at the hospital at about 1:30 A.M., reporting that they awoke to find the twin not breathing. She was pronounced dead at 2:22 A.M. with an unknown cause of death.

4

The parents inaccurately reported to the hospital that they lived at an address in Taunton.

Upon learning of the twin's death, the department tried to reach the parents, but its calls went unanswered. The mother later admitted that she changed her cell phone number on the day the twin died. The department decided to conduct an emergency removal of the child but was unable to locate the parents at their previously reported addresses. When a detective was able to make contact with the parents, they refused to disclose their whereabouts, stating that they were living in "Attleboro and other places." On November 8, 2018, the State police were able to track the parents' phones to a motel in Wrentham. When officers and department workers arrived at the motel to take custody of the child, they observed that the room was dark and cluttered with piles of boxes and belongings. It appeared that the family had been living there for some time.

The child was removed from the parents' custody, and the department filed a care and protection petition the same day. The next day, a social worker met with the parents to discuss the reasons for the removal and the parents' interim action plan. When the mother saw that the action plan mentioned her prior department case involving the son, she became irate, started swearing, and accused the social worker of targeting her. At some point in November 2018, an autopsy revealed that

5

the twin's cause of death was sudden infant death syndrome (SIDS).[3]

After a seventy-two hour hearing, which extended over several months and concluded in March 2019, the department maintained temporary custody of the child. In July 2019 the child's goal was changed to permanency through adoption because the parents had not completed any action plan tasks or engaged with any services. As a result the department was unable to assess their ability to care for the child.

Throughout the pendency of the case, the mother made it clear that she was not interested in working with the department in any way and would communicate only to schedule parent-child visitation. The mother also repeatedly engaged in threatening and violent behavior toward department workers. During her first visit with the child in December 2018, the mother became upset when the social worker warned her not to have inappropriate conversations in front of the child and said, "Let's take this somewhere more appropriate," causing the social worker to ask a police officer to intervene. At a visit in February 2019, the parents became upset they were not informed that the child was teething, and they became aggressive toward the social worker. The mother called the social worker a

---

[3] The exact date of the autopsy is unclear from the record.

"fucking cunt" and a "bitch" and threw a backpack at her. Despite multiple warnings, the mother did not calm down. Because of the parents' behavior, the department temporarily halted visitation until it could meet with the parents and their attorneys, and it agreed to resume visitation only with a police detail present.

The parents also made numerous threats to department workers over the phone and in voicemails, causing the department to put safety plans in place. In March 2019 the mother said to the department's area program manager, "Fuck you. I hope you die and get a bullet in your head." The mother further said that, if the department did not bring the child to her grandmother in Florida, it "would be hearing from [the] [f]ather." When told that this language was threatening, the parents replied, "We don't make threats. We make promises." On another occasion the mother told a social worker, "This bitch needs to watch her back because I'll get you."

The parents' anger and aggression interfered with facilitating parent-child visits, and they refused to attend visits except on their own terms. The parents claimed they were only available for visits from 4 to 5 P.M. on Fridays or Saturdays after noon. The department made a referral to a visitation center, which offered the parents a biweekly slot on Mondays from 4 to 6 P.M. The mother declined, stating, "I need

to do things for myself after work hours"; when asked whether she could do 5 P.M., the mother stated she was "unavailable." The mother did not visit with the child for six months beginning in September 2019.  When she did attend visits, she sometimes arrived late and took the position that "[n]othing comes before work."  She also had concerning interactions with the child during visits.  On one occasion the mother refused to give the child a bottle and became angry when she realized that the child was using a pacifier, both prescribed by the child's pediatrician.  When the child (then less than one year old) started crying, the mother said, "Enough is enough."  Another time, when the child screamed and tried to get off the father's lap, the mother told him to "restrain" the child because that is how to discipline children and that, if the child wants to "hit her head she can.  She will have to learn the hard way."

At no time was the department able to view the parents' home or confirm their whereabouts because they refused to disclose their address or allow home visits.  After the case was filed, the parents appeared to be moving between various motels, but they did not allow the department to see where they were living.  The department made a referral to its housing specialist, who tried to contact the parents three times in December 2020 with no success.

The department also made several attempts to address the mother's mental health issues with therapy, but she declined. The mother claimed that she was unable to participate because she worked full time and that the father was her "therapist" despite his having no specialized training. The mother admitted at trial that she continued to consume marijuana in such large amounts that "it would take a long time for the marijuana to come out of her system."

In July 2020 the child was placed in a kinship preadoptive home. At the time of trial, the child was up to date medically, had no specialized needs, and had reached all developmental milestones. The department conducted several visits of the preadoptive home and reported it had no concerns about the home or the family.

Discussion. "To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs,

affections, and age." Care & Protection of Vick, 89 Mass. App.
Ct. 704, 706 (2016).

Here, the department met its burden of proving the mother's
unfitness by clear and convincing evidence.  The department was
justified in removing the child on an emergency basis, in light
of the twin's death, the mother's substance use and mental
health issues, and her unclear housing situation.[4]  In the over
two years between the removal and the commencement of trial, the
mother refused to cooperate with the department or engage in
services, leaving the department unable to assess her ability to
parent the child.  Where the department had legitimate concerns
about the child's safety and wellbeing in the mother's care, the
mother's total refusal to cooperate with the department was a
significant factor in assessing her fitness.  See Adoption of
Rhona, 63 Mass. App. Ct. 117, 126 (2005).  This is especially so
where the concerns raised in this case were the same ones that
led to the mother previously losing custody of her son.  See

---

[4] The mother acknowledges that the twin's death justified
the emergency removal of the child.  To the extent the mother
argues that the department failed to make reasonable efforts to
return the child to her care after the autopsy revealed that the
twin died of SIDS, she did not file a motion raising this
argument in the trial court, nor did she file a petition to a
single justice of this court challenging the temporary custody
order.  Any issues concerning the initial removal have now been
subsumed by the judge's decision after trial.  The mother does
not challenge the judge's finding, based on the evidence at
trial, that the department satisfied its obligation to make
reasonable efforts.

Adoption of Diane, 400 Mass. 196, 204 (1987) ("The judge could properly rely upon prior patterns of ongoing, repeated, serious parental neglect . . . in determining current unfitness").

The department presented evidence that those concerns persisted and went unaddressed during this case because of the mother's failure to participate in services. The mother continued to struggle with housing instability, was untruthful or unforthcoming about her whereabouts, and would not allow a home visit throughout the pendency of the case. Even when the department provided a referral to a housing specialist, the mother refused to engage. See Adoption of Oren, 96 Mass. App. Ct. 842, 845 (2020) (inability to maintain stable housing may be considered in determining parental fitness). The mother also declined therapy to treat her mental health issues, continuing instead to self-medicate with heavy marijuana use. "In addition to mental health concerns, evidence of alcohol or drug use is relevant to, but not dispositive of, 'a parent's willingness, competence, and availability to provide care.'" Adoption of Luc, 484 Mass. 139, 147 (2020), quoting Care & Protection of Frank, 409 Mass. 492, 494 (1991).

Furthermore, the mother's behavior during these proceedings supported the judge's conclusion that she lacked the temperament and capacity to provide for the child's needs, especially when considering the child's young age. See Care & Protection of

11

Vick, 89 Mass. App. Ct. at 707-708.  The judge made detailed findings about the mother's verbal and physical abuse of department workers, which often occurred in front of the child.  See Adoption of Yvonne, 99 Mass. App. Ct. 574, 580 (2021) (proper for judge to consider mother's threats to department staff in assessing her fitness).  The judge further found that the mother was "combative and disruptive" throughout trial, showing that her "violence of temper" persisted.  See id. ("A parent's behavior during trial and her ability to manage anger are relevant to parental fitness").  The mother's violent and threatening conduct necessitated a police detail during parent-child visitation, which affected the number of visits that the mother could have with the child.  In addition, the mother's unreasonable limitations on when she would attend visits resulted in long stretches of time where she did not see the child, which the mother acknowledged was detrimental to developing a bond between them.  The mother's attitude toward visits demonstrated her lack of focus on parenting the child and her inability or unwillingness to put the child's needs above her own.  See Care & Protection of Vieri, 92 Mass. App. Ct. 402, 405 (2017) (parent's inconsistent attendance at visits relevant to determination of unfitness).  The mother also displayed a lack of understanding of the child's needs during the visits she

12

did attend, yet declined to participate in a parenting class, claiming there was no need for it.

This "constellation of factors" established the mother's unfitness by clear and convincing evidence.  Adoption of Greta, 431 Mass. 577, 588 (2000).  Although the mother was undoubtedly grieving the loss of the twin, her failure to engage with her action plan tasks for years left her parenting deficits unaddressed and prevented her from assuming parental responsibility for the child.  The judge thus did not err in finding the mother unfit.  For the same reasons, the judge was within her discretion to conclude that the mother's unfitness was not merely temporary and that termination of her parental rights would serve the child's best interests.  See Adoption of Ilona, 459 Mass. 53, 59-60 (2011).

Decree affirmed.

By the Court (Rubin, Shin & Hodgens, JJ.[5]),

Paul Pett't

Clerk

Entered: January 14, 2025.

---

[5] The panelists are listed in order of seniority.

13