NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1260

ADOPTION OF NAIRN.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree of the Juvenile Court finding him unfit to parent his son (child), terminating his parental rights, and approving the adoption plan proposed by the Department of Children and Families (DCF).  We conclude that evidence of the father's persistent incarcerations combined with his unresolved mental health issues and housing instability, was sufficient to support the judge's findings that the father was currently and indefinitely unfit and that termination was in the best interests of the child.  Further concluding that DCF, which intended to reunify the child with the father before the father's mental health deteriorated and he was again incarcerated, made reasonable efforts at reunification, we affirm.

---

[1] The mother, who neither appeared at trial nor appealed from the termination of her parental rights, is not a party to this appeal.

Background.  One day after the child's birth, DCF received a G. L. c. 119, § 51A report alleging neglect of a substance exposed newborn.  Both the child and the mother tested positive for cocaine and prescribed methadone at birth.  In light of various factors including concerns related to the father's criminal history and incarceration, and the child's wellbeing, the child has been in DCF care since December 21, 2021.

The father has an extensive criminal record spanning multiple States.  In Massachusetts, the father's criminal record consists of myriad adult charges and convictions between 1995 and 2023, including approximately thirteen violations of probation.  The father was also incarcerated for nine years in a Federal prison in Texas for conspiracy charges and spent two years in Washington State prison in 2002.  In all, the father "has spent more than half of the past twenty years incarcerated," and was unable to care for the child for much of the child's life.  Indeed, the father was incarcerated at the time of the child's birth and at the time of trial.

On December 22, 2021, at the beginning of the child's life, DCF gave the father an action plan while he was incarcerated.  Upon release, the father met with DCF staff and followed the requirements of the action plan for several months.  This included participating in individual therapy for mental health issues and substance abuse programs.  Because the father was

2

following the action plan, DCF began to create a reunification plan for the father.

The father, however, had not addressed his mental health and showed a detachment from reality.[2] In July 2023, "[h]is mental health appear[ed] to have deteriorated." Around this time, he reportedly walked around naked in the common areas of the multifamily building where he lived and exposed himself to neighbors. Also, on July 23, 2023, police officers served the father with three "harassment orders," and the father was ultimately admitted to a hospital for a G. L. c. 123, § 12 psychological evaluation because of his escalated behaviors and suicidal ideations.

The father's behavior continued to deteriorate, and, by September 30, 2023, he was arrested again following a standoff with the police and "S.W.A.T." during which he barricaded himself in a motel room. Following this arrest, a toxicology screen was positive for cocaine, resulting in the judge's discrediting any claims that he was not using illicit substances.[3] The father, nonetheless, explained to a social

---

[2] Much of the father's trial testimony was not credited by the judge because of, inter alia, "serious concern for Father's mental health and perceptions of reality based on his testimony."

[3] At trial, the father invoked his right against self-incrimination with respect to certain events, and the judge drew

3

worker that he believed he was targeted as part of "protocol 11," a "plan from the government that targeted him as someone who needed to be taken out." He also testified that he is "the Messiah."

Finally, partly because of the significant amount of time he has been incarcerated, the father has a history of housing instability. In July 2023, prior to his most recent incarceration, the father was served an eviction complaint because of three harassment orders from neighbors and because he was behind in his rent payments. The father claims, but the judge did not credit, that he has the option to live in one of two apartments that he manages after his release from incarceration.

Following trial, the judge ordered the entry of decrees finding the mother and the father unfit and terminating their parental rights. The judge also approved the adoption plan proposed by DCF.

Discussion. 1. Termination of parental rights. The father contends that some portions of the judge's findings[4] were

_____

a negative inference regarding his refusal to testify about those topics.

[4] Specifically, the father argues incarceration alone does not conclusively render him unfit, that without evidence of a cocaine habit that caused unacceptable care or expert testimony that "child abuse and neglect [was] the inevitable result of a Cocaine habit," the judge's prediction that "such will occur"

4

erroneous and that absent those findings, DCF did not meet its burden to prove parental unfitness by clear and convincing evidence.  We disagree.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021).  "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age."  Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016).  "Because termination of a parent's rights is an 'extreme step,' . . . a judge must decide whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992).  We give substantial deference to the judge's findings, which we do not disturb

---

was improper, and that the father's religious beliefs do not make him unfit to provide minimally acceptable care.

5

unless they are clearly erroneous.  See Adoption of Jacques, 82 Mass. App. Ct. 601, 606-607 (2012).

We first note that the judge's extensive findings support his conclusion that the father was unfit to parent the child. While the father may be correct that the three findings he challenges were insufficient to support a finding of unfitness when viewed in isolation, the record as a whole more than supports the judge's critical subsidiary findings, and "the judge's overall conclusion of parental unfitness is fully supported by the record."  Adoption of Helen, 429 Mass. 856, 860 (1999).  The record supports the judge's findings that the father, inter alia, was incarcerated both during the child's birth and during trial; has approximately 116 adult criminal charges in Massachusetts alone; has spent more than ten of the last twenty years incarcerated; has a history of failing to comply with the terms of his probation; has a history of housing instability; exposed himself to his neighbors; was in a standoff with S.W.A.T. and police on September 30, 2023; has significant mental health issues that he has not addressed; believes the government is targeting him under protocol 11; has a history of cocaine use; and, despite having a reunification plan, was unwilling to adjust his conduct to refrain from criminal activities.  See Care & Protection of Quinn, 54 Mass. App. Ct. 117, 126-127 (2002) (despite father's participation in programs

6

and cooperation with DCF, lack of evidence of any longstanding attitude or behavior change supported judge's finding of unfitness). In the months leading up to the trial, he also failed to "consistently or meaningfully" engage in his action plan tasks. The judge's findings are specific, detailed, and demonstrate close attention to the evidence. See Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008). Accordingly, the finding of unfitness was supported by clear and convincing evidence.

Similarly, the judge's extensive findings support his conclusion that termination of the father's parental rights was in the best interests of the child. A finding of unfitness alone is insufficient to terminate the parental rights to a child. Rather, the judge must find by clear and convincing evidence that the child's "best interests will be served by terminating the legal relation between parent and child" (citation omitted). Adoption of Helga, 97 Mass. App. Ct. 521, 527 (2020). "Because the termination of parental rights is an 'extreme step,' . . . we require that the judge articulate specific and detailed findings in support of a conclusion that termination is appropriate, demonstrating that she has given the evidence close attention." Adoption of Nancy, 443 Mass. 512, 514-515 (2005). "A judge's findings are entitled to substantial

deference, and we will not disturb those findings unless they are clearly erroneous." Adoption of Helga, supra at 528.

Here, the judge's findings demonstrate that his decision to terminate the father's parental rights was based on the father's housing instability, drug abuse, criminal record, and mental health. Furthermore, the judge considered the required factors in G. L. c. 210, § 3 (c), and found factors (ii), (iii), (v), (vi), (vii), (viii), (xii), and (xiii)[5] applicable. We discern no clear error in the judge's determination, supported by clear and convincing evidence, that termination of the father's parental rights is in the best interests of the child.

2. Factor (vii). The father maintains that the judge's findings to the effect that (1) the child would suffer harm if removed from his current placement, and (2) the father would be ill-equipped to perform parental responsibilities, were not supported by the record. We disagree. The record supports the finding of a bond between the child and the preadoptive parents.[6]

_____

[5] There was no error in the judge's application of G. L. c. 210, § 3 (c) (xiii). At the time of trial, the father was incarcerated for violating his probation on a felony charge of possession with the intent to distribute a Class B substance.

[6] The judge found, inter alia, that "[the child] has formed a loving relationship with his pre-adoptive parents and brother." The child "seeks out his pre-adoptive parents, runs to them for hugs, and is happy when one of them walks through the door. [He] gets along very well with the other child in the home, and they are 'thick as thieves.'" The evidence at trial

8

The record likewise supports the judge's finding that the father will not achieve fitness as a parent. As detailed above, while the father followed DCF guidance for a brief period, his improvement was short lived and was followed by more criminal charges, mental health issues, and lack of housing; thus it is almost certain his conduct will persist into the future. "In these circumstances, where the father has had ample opportunity to achieve fitness as a parent but has failed to follow through, it is only fair to the child[] to say, at some point, 'enough.'" Adoption of Nancy, 443 Mass. at 517.

3. Reasonable efforts. For the first time on appeal, the father claims DCF failed to make reasonable efforts to reunify him and the child while he was incarcerated.[7] "[The father] must raise a claim of inadequate services in a timely manner so that reasonable accommodations may be made." Adoption of Gregory, 434 Mass. 117, 124 (2001). Accord Adoption of West, 97 Mass. App. Ct. 238, 242 (2020). Thus, arguments regarding reasonable efforts are waived.[8]

_____

supported these findings, which are not challenged by the father.

[7] The father filed one motion related to visitation in August 2022 but withdrew it without a hearing in January 2023.

[8] The cases the father cited at oral argument are not persuasive or are inapposite. See Commonwealth v. Randolph, 438 Mass. 290, 294-295 (2002) (reviewing default standard of review for waived issues in criminal cases); Adoption of Mary, 414

9

In any event, the judge found that DCF communicated with the father by providing him with action plans both during his incarceration and after his release, but the father's participation with DCF was inconsistent at best.[9]  There was ample trial evidence supporting the judge's determination that DCF met its obligations.  See Adoption of Ilona, 459 Mass. at 61.  DCF worked extensively with the father after the determination of paternity and placed itself in a position to reunify the child with the father that was thwarted only by the father's mental health deterioration and return to criminality.  Once he was returned to incarceration, DCF stayed in contact with the father and reasonably saw no need to arrange for services or visits in prison because the father repeatedly informed the social worker that his release was imminent and so they "planned to resume upon release."

Even if DCF did not engage in reasonable efforts, a finding of lack of reasonable efforts in the present case is not sufficient to override the child's best interests.  See Adoption of Ilona, 459 Mass. at 461, quoting G. L. c. 119, § 29C ("A

_____

Mass. 705, 712-713 (1993) (addressing failure to raise postadoption visitation because of ineffective assistance of counsel).

[9] We note the father's paternity was not established until 2023, after his release from his incarceration at the time of the child's birth.

10

determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest").  In view of the well-supported determinations that the father is "currently unfit to assume parental responsibilities for the [child]" and that his "unfitness is likely to continue into the indefinite future to a near certitude," the judge did not abuse his discretion in concluding that the best interests of the child were served by terminating the father's parental rights.  See Adoption of Elena, 446 Mass. 24, 30-31 (2006).

Decree affirmed.

By the Court (Neyman,
Ditkoff & Englander, JJ.[10]),

*Paul Little*

Clerk

Entered:  September 29, 2025.

---

[10] The panelists are listed in order of seniority.