NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-394

ADOPTION OF BRYAN.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree entered by a judge of the Juvenile Court finding her unfit to parent her child, Bryan, terminating her parental rights as to Bryan, and failing to order a specific minimum number of postadoption visits per year. We affirm.[2]

Background.  We summarize the relevant facts and procedural history as set forth in the judge's decision and as supported by the record.  Bryan was born in January 2013 and was eleven years

---

[1] A pseudonym.

[2] No father was listed on the child's birth certificate.  In addition, throughout the pendency of this case, the Department of Children and Families (DCF) was unable to establish contact with the man identified as the father, and no other parent came forward to establish paternity of Bryan.  The judge ultimately deemed the father "and/or unknown father unfit as a result of being unwilling, incompetent, and/or unavailable to further the interest of the subject child."

old at the time of trial, and the mother was twenty-nine years old at the time of trial.  The mother was intermittently involved with the Department of Children and Families (DCF) throughout her own childhood, and at age fifteen was placed in DCF custody and resided in a foster home for a brief period.

On November 7, 2019, a mandated reporter filed a G. L. c. 119, § 51A report (51A report) with DCF alleging neglect of Bryan by the mother.  At that time, the mother resided with her sister and Bryan's maternal grandmother.  The maternal grandmother had called the police to report that the mother, the sister, and the sister's boyfriend were in a verbal altercation in Bryan's presence.  During the ensuing investigation, it was learned that Bryan had a substantial number of absences from school, and that the mother had met with Bryan's school counselor to discuss obtaining evaluations for attention deficit hyperactivity disorder (ADHD) and an individualized education plan (IEP) for Bryan, but had walked out of the meeting when ADHD medications were suggested.  The mother agreed upon a plan for the mother to, inter alia, work with Bryan's school to address his educational needs and behaviors and follow up with medical providers, and then "the allegation of neglect was ultimately unsupported, and the case was closed."

In November 2020, another 51A report alleging neglect by the mother was filed.  The ensuing investigation revealed that

2

the mother failed to follow through on the agreed-upon plan, did not timely enroll Bryan in school, and for several months in 2020 purported to "homeschool" Bryan, which consisted of using worksheets the mother obtained from a friend. The mother reenrolled Bryan in school in October 2020, but the school confirmed that initially Bryan had not logged on to the video conferences for any of his classes up through the date of the 51A report, and subsequently Bryan was logging on but not turning on his video or responding when called upon.[3] Furthermore, the mother did not sign the consent form to allow the school to conduct testing for an IEP. DCF ultimately concluded the investigation and supported the allegation of neglect.

A clinical case was opened and the mother's action plan required her to, inter alia, meet with the social worker monthly, follow through with recommendations, attend therapy, work with a parenting aide, and ensure that Bryan regularly attended school.[4] The mother was referred to a parenting aide and an individual therapist, but both services closed out due to

---

[3] At this time the school was conducting classes by video conference due to the COVID-19 pandemic.

[4] The mother was diagnosed with anxiety and depression by her primary care physician.

the mother's noncompliance.[5]  The mother failed, again, to consent to any IEP assessment for Bryan.  In addition, between late 2020 and April 15, 2021, Bryan was absent from school twenty times, late forty-nine times, and the school staff subsequently filed a complaint under G. L. c. 76, § 2, against the mother in the Juvenile Court due to Bryan's "chronic absenteeism."  The mother did consent to an ADHD evaluation in 2021, and Bryan's doctor prescribed medication to treat Bryan's ADHD.  The mother, however, failed to take Bryan to his follow-up appointments and was resistant to having Bryan take his medication, and Bryan's school counselor expressed concern that Bryan was not taking his ADHD medication and was missing his medical appointments.

From September 15, 2021, to October 13, 2021, Bryan was placed in the temporary custody of the maternal grandmother. When it was discovered that the maternal grandmother had failed to provide Bryan with his medication or cooperate with DCF, a Juvenile Court judge directed the Worcester Probate and Family Court probation department to file a care and protection petition on behalf of Bryan in the Juvenile Court.

---

[5] In April 2021, the school filed another 51A report, which was subsequently screened out.  A few weeks later, yet another 51A report was filed involving, inter alia, an allegation of physical abuse.  That allegation was also unsupported.

Following the removal of Bryan, the mother's action plan was updated several times.  The mother failed to perform the vast majority of the tasks on her action plans.  Specifically, the mother failed to, inter alia:  cooperate with DCF, schedule and attend monthly visits with DCF, engage in therapeutic services, schedule and consistently attend visits with Bryan, obtain safe and stable housing,[6] contact Bryan's providers, or consistently attend her weekly visits with Bryan.  From October 2021 to November 2022, the mother attended only thirty-two of fifty-eight offered visits with Bryan, and of the visits she did attend, she was late to nearly half of them.  Her inconsistent visitation attendance continued from November 2022 to April 2024.  The mother was uncooperative with DCF and told a social worker, "We are going to get Bryan back very soon and it is not going to be through DCF, the courts, or the action plan."  In addition, her "presentation and behavior at several visits" contributed to DCF's "concern for her mental health and ability to speak appropriately with Bryan."  During trial, Bryan testified that he did not want to resume supervised visits with the mother, and "[a]s of the conclusion of trial," Bryan "continued to refuse to attend supervised visits with [the]

_____

[6] After Bryan was removed from the mother's custody, she lived in four different locations:  with her grandparents; at an "AirBnB" paid for by her mother; at an apartment; and with her mother.

5

[m]other."  Indeed, "[d]espite her awareness that her inconsistent attendance significantly impacted Bryan's emotional well-being, [the] [m]other refused to take responsibility for her inconsistency and did not improve her attendance."  Bryan, however, showed improvement, he took his prescribed medication, attended therapy, and his behavior at school improved.

After DCF removed Bryan in October 2021, Bryan was placed in several different foster homes and a kinship placement.[7] Bryan exhibited significant behavioral issues at some of the placements, including aggressive behaviors toward pets and other children in the homes.  On September 14, 2022, DCF changed Bryan's permanency plan from reunification to adoption.  In October 2022, Bryan was placed in the care of his foster mother with whom he remained through trial.

In November 2023, the mother completed a mental health intake assessment and was assigned a therapist.  However, she only attended two therapy sessions before reporting to DCF that she no longer attended due to an issue with health insurance. DCF again provided a referral for in-home therapy to improve the communication between her and Bryan, but the mother failed to complete the intake assessment.

---

[7] One of Bryan's foster resources gave notice that she could not continue to serve as his placement and expressed concern to DCF that the mother was stalking Bryan.

Following a trial in September 2024, the judge ordered the entry of a decree finding the mother unfit[8] and terminating her parental rights. The judge also found that "there is an existing bond between [the] [m]other and Bryan," and that terminating posttermination and postadoption contact between the mother and Bryan would not serve the child's best interests. However, "given the current state of the [the] [m]other's relationship with the subject child," the judge declined to order a specific number of visits and instead left to Bryan's legal custodian the right to determine the amount and frequency of contact between the mother and Bryan. The mother appeals from the decree.

Discussion. 1. Unfitness and termination of parental rights. The mother contends, in essence, that the finding of her unfitness stemmed from Bryan's undiagnosed issues; that she persisted in efforts to have him take his medication; that he now takes his medication regularly and has achieved positive results therefrom; and that the judge should have found a reasonable likelihood that the mother's unfitness was only temporary. The argument is unavailing.

---

[8] "Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother . . . [does] not love the child . . . ." (citation omitted). Adoption of Bea, 97 Mass. App. Ct. 416, 417 n.2 (2020).

7

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). We give substantial deference to the judge's findings, which we do not disturb unless they are clearly erroneous. See Adoption of Jacques, supra at 606-607.

The mother's unfitness resulted from a "constellation of factors." Adoption of Greta, 431 Mass. 577, 588 (2000). The evidence supported the judge's ultimate findings that the mother is presently unfit to parent Bryan and her unfitness is likely to continue indefinitely, i.e., there is "a reasonable expectation that [she] will not be able to provide proper care or custody within a reasonable time considering the age of the child." G. L. c. 210, § 3 (c) (vi). As the judge found, consistent with plentiful evidence, the mother failed to demonstrate the willingness and ability to understand Bryan's needs, address her own mental health concerns, comply with the

majority of her action plan tasks, take advantage of services, cooperate with DCF, obtain safe and stable housing, or consistently attend visits with Bryan.[9]  See Adoption of Ramon, 41 Mass. App. Ct. 709, 717-718 (1996).  Combined with the findings regarding the mother's past history of educational neglect of Bryan and the "clear nexus between [the] [m]other's lack of insight [into her parental shortcomings] and her ability to provide for [Bryan's] needs," the facts considered together supported the judge's determination, by clear and convincing evidence, that the mother is unfit and likely to be so for the indefinite future.

As to termination of parental rights, the judge evaluated the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (iii), (iv), (vi), (viii), (ix), (xii), and (xiv) to be applicable.  The record supports these determinations.  Moreover, as detailed above, in light of the mother's ongoing inability and unwillingness to recognize and address her parental deficits, there was ample record evidence to support

---

[9] When determining a parent's fitness, one factor a judge shall consider is the willful failure to visit a child when the child is not in the parent's custody.  G. L. c. 210, § 3 (c) (x).  The judge's finding that the mother's inconsistent visitation attendance was evidence of her unfitness was not clearly erroneous.  See Care & Protection of Vick, 89 Mass. App. Ct. at 708.

the judge's determination that termination of her parental rights was in the child's best interests.

2. **Impact of placement with maternal grandmother**.  The mother also argues that DCF was reckless and violated the mother's constitutional rights by placing Bryan with the maternal grandmother, who had allegedly neglected the mother over the years.  The mother did not raise this issue at or prior to trial.  Accordingly, the argument is waived.  See Adoption of West, 97 Mass. App. Ct. 238, 242-243 (2020).

3. **Posttermination and postadoption visitation**.  We are likewise unpersuaded by the mother's argument that the judge abused his discretion in refusing to order a specific minimum number of postadoption visits between the mother and Bryan each year.  Judges have broad discretion to order posttermination and postadoption visits per year.  See Adoption of Douglas, 473 Mass. 1024, 1027 (2016).  The two primary considerations governing postadoption visitation are (1) whether postadoption visitation is grounded in the child's best interests, and (2) the constitutional rights of the adoptive parents.  See Adoption of Vito, 431 Mass. 550, 562 (2000).

Here, the judge weighed all the relevant factors he was obligated to consider when determining whether and to what extent contact is in the child's best interests.  See, e.g., Adoption of Ilona, 459 Mass. 53, 63-66 (2011); Adoption of Vito,

431 Mass. at 553.  The judge determined that postadoption visitation between Bryan and the mother was in Bryan's best interests based on their emotional bond, but properly sought to balance the benefit to the child of an order of visitation with, inter alia, Bryan's current and repeatedly expressed desire to have no contact with the mother at the present time.  Cf. Adoption of Daisy, 77 Mass. App. Ct. 768, 783 (2010), S.C., 460 Mass. 72 (2011) (DCF "was not in a position to force an eleven year old child to attend visits against her will").  The judge then concluded that it was in Bryan's best interests not to order a specific number of visits but to leave it to the discretion of the custodian of Bryan with deference to Bryan. On the record before us, we cannot say that the judge's decision constituted "a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Decree affirmed.

By the Court (Blake, C.J., Neyman & Grant, JJ.[10]),

*Paul Little*

Clerk

Entered:  December 17, 2025.

---

[10] The panelists are listed in order of seniority.

11